# CV16-0326

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

OLGA CABALLERO; JIE DU, by her next friend MICHAEL
TONG; and ALEJANDRA NEGRON,
individually and on behalf of all others similarly situated,

Plaintiffs,

-against-

SENIOR HEALTH PARTNERS, INC; HEALTHFIRST, INC;
HF MANAGEMENT SERVICES, LLC;  HEALTHFIRST
HEALTH PLAN, INC.; XYZ CORPORATIONS 1-10;
HOWARD ZUCKER, as Commissioner
of the New York State Department of Health; and
SAMUEL D. ROBERTS, as Commissioner of the
New York State Office of Temporary and
Disability Assistance,

Defendants.

------------------------------------------------------------------------x

**CLASS ACTION
COMPLAINT**

**AMON, CH.J.**

**POLLAK, M.J.**

FILED
CLERK
2016 JAN 21  PM 2: 56
U.S. DISTRICT COURT
EASTERN DISTRICT
NEW YORK

## PRELIMINARY STATEMENT

1.     Plaintiffs OLGA CABALLERO; JIE DU, by her next friend MICHAEL TONG;

and ALEJANDRA NEGRON bring this class action on behalf of themselves and a class of all

current and future Medicaid recipients who receive or will receive Medicaid-funded home care

services through Defendants Senior Health Partners or Healthfirst CompleteCare, two Managed

Long Term Care health plans in New York State.  The class consists of thousands of vulnerable

and indigent people who depend on Medicaid-funded home care services to live safely in their

homes and who are threatened with or suffering from reductions of their necessary care.

2.     Defendants Senior Health Partners, Inc., HF Management Services, LLC,

Healthfirst Health Plan, Inc., and Healthfirst, Inc. (collectively referred to as the "Healthfirst

Defendants")  provide a variety of programs through which Medicaid recipients can receive

home care services.  The two plans at issue here are both Managed Long Term Care (MLTC) plans:  Senior Health Partners and Healthfirst CompleteCare.  These two MLTC plans are available to New York Medicaid recipients in certain geographic areas who would be eligible for nursing home admission and who are expected to need long term care services for at least 120 days.  These plans must provide home care in accordance with Medicaid laws and regulations.

3.      Defendant Zucker is required by law to ensure that all Medicaid recipients in the State receive the services and protections mandated by federal and state laws, regulations and Constitutions.  The contract between Zucker and Healthfirst Defendants requires Healthfirst Defendants to comply with all applicable federal and state laws and regulations.

4.      Plaintiffs seek injunctive and declaratory relief from the Healthfirst Defendants' systemic practice of threatening to reduce or actually reducing Medicaid-funded home care services based on arbitrary limits and without the timely and adequate notice required by law, and Defendant Zucker's systemic practice of failing to ensure that Healthfirst Defendants comply with the Medicaid Act, 42 U.S.C. § 1396 *et seq.*, its implementing regulations at 42 C.F.R. § 431.100 *et seq.* and § 438.100 *et seq.*, the New York State Social Services Law § 22 and its implementing regulations , and the Due Process Clauses of the 14th Amendment to the U.S. Constitution and of the New York State Constitution.

5.      Commissioner Zucker has delegated to Defendant Roberts, the Commissioner of the New York State Office of Temporary and Disability Assistance, the responsibility to schedule and hold Fair Hearings and to order aid-continuing when required by federal and state laws and regulations.

6.     Plaintiffs also seek injunctive and declaratory relief from Defendant Robert's systemic practice of failing to timely order aid to continuing for class members who timely request Fair Hearings, in violation of Plaintiffs' rights under 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 438.420, 438.424; N.Y. Soc. Serv. L. §§ 22(12), 365-a(8) and their implementing regulations; and the Due Process clauses of the 14th Amendment to the United States Constitution, U.S. Const. Amend. XIV, § 1, and of the New York State Constitution, N.Y. Const. Art. I, § 6.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.  This action is authorized by 42 U.S.C. § 1983 as an action seeking redress of the deprivation of statutory and constitutional rights under color of law.

8.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) because it is the judicial district in which a substantial part of the events giving rise to the claims occurred.

## PARTIES

9.     Named Plaintiff OLGA CABALLERO is a 67 year old woman who lives alone in Brooklyn.  She is a recipient of Medicaid and Medicare, and receives home care services through the Healthfirst Defendants.

10.     Named Plaintiff JIE DU is a 96 year old woman who lives alone in Brooklyn, New York. Michael Tong is her son-in-law and next friend.  She brings this action by her next friend because she cannot adequately represent herself or understand the nature of the claims herein. She is a Medicaid recipient who receives home care services through the Healthfirst Defendants.

3

11.     Named Plaintiff ALEJANDRA NEGRON is a 71 year old woman who lives alone in Manhattan.  She is a Medicaid recipient who receives home care services through the Healthfirst Defendants.

12.     Defendant SENIOR HEALTH PARTNERS, INC., is a Managed Long Term Care Plan owned by Defendant HF Management Services, LLC.  It authorizes Medicaid funded home care services to eligible Medicaid recipients.  Upon information and belief, Senior Health Partners also administers Healthfirst CompleteCare, a MLTC that authorizes home care services to Medicaid recipients who are also enrolled in Medicare.  It maintains an office at 100 Church Street, New York, N.Y.

13.     Defendant HF MANAGEMENT SERVICES, LLC is the parent corporation of Defendant Senior Health Partners and is therefore responsible for the actions of its subsidiary.  Upon information and belief, HF Management Services, LLC also administers Healthfirst CompleteCare, a MLTC that authorizes home care services to Medicaid recipients who are also enrolled in Medicare.  It maintains an office at 100 Church Street, New York, N.Y.

14.     Defendant HEALTHFIRST HEALTH PLAN, INC. is a New York corporation that authorizes services to New York state enrollees of both Medicaid and Medicare.  Upon information and belief, Healthfirst Health Plan, Inc. also administers Healthfirst CompleteCare, a MLTC that authorizes home care services to Medicaid recipients who are also enrolled in Medicare.  It maintains an office at 100 Church Street, New York, N.Y.

15.     Defendant HEALTHFIRST, INC. is the parent corporation of Healthfirst Health Plan, Inc. and is therefore responsible for the actions of its subsidiary.  Upon information and belief, Healthfirst, Inc. also administers Healthfirst CompleteCare, a MLTC that authorizes

home care services to Medicaid recipients who are also enrolled in Medicare.  It maintains an office at 100 Church Street, New York, N.Y.

16.     The Healthfirst Defendants have contracts with Defendant Zucker pursuant to which they authorize Medicaid-funded home care services to eligible Medicaid recipients enrolled in their plans.

17.     Defendant HOWARD ZUCKER is the Commissioner of the New York State Department of Health ("DOH"), and as such is responsible for the administration of the Medicaid program in the State of New York.  He maintains an office at Corning Tower, Empire State Plaza, Albany, New York.

18.     Defendant SAMUEL D. ROBERTS is the Commissioner of the New York State Office of Temporary and Disability Assistance ("OTDA") and pursuant to a delegation of authority from Defendant Zucker,  is responsible for the operations of the Office of Fair Hearings, including but not limited to sending aid-continuing directives to Managed Long Term Care plans such as the Healthfirst Defendants. He maintains offices at 40 North Pearl Street, Albany, New York and at 14 Boerum Place, Brooklyn, New York.

## LEGAL FRAMEWORK

### A.     *New York's Administration of Medicaid-Funded Home Care Services*

19.     The Medical Assistance Program ("Medicaid") is a joint federal-state program established under Title XIX of the Social Security Act ("Medicaid Act") to ensure that rehabilitation, medical care, nursing, and other services are provided to low-income and indigent people. 42 U.S.C. § 1396 *et seq.*

20.     States that elect to participate in the Medicaid program must comply with requirements set out in federal law and regulations to be eligible for federal funds.  42 U.S.C. §§ 1396a, 1396c.

21.     For example, federal law requires participating states to administer the Medicaid program through a "single state agency."  42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10(b)(1). While the single state agency may delegate certain functions, including the function of conducting fair hearings, it is prohibited from delegating "the authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters."  42 C.F.R. § 431.10(c), (e).

22.     Additionally, participating States must administer the Medicaid program according to a plan that has been federally approved.  42 C.F.R. § 431.11.

23.     New York participates in the Medicaid program.  The single state agency responsible for the administration of the Medicaid program in New York is the New York State Department of Health, of which Defendant Zucker is the Commissioner.  N.Y. Soc. Serv. L. § 363-a(1); 1996 N.Y. Laws Ch. 474, §§ 233–248.

24.     With the approval of the Centers for Medicare and Medicaid Services of the United States Department of Health & Human Services ("CMS"), New York operates its Medicaid program using a "Partnership Plan" that, in relevant part, requires most Medicaid recipients to enroll in a managed care organization ("MCO") with which DOH has contracted.

25.     MCOs are privately-owned and operated health insurance entities which contract with State Medicaid programs to provide Medicaid recipients with a package of covered services in exchange for payment by the State of a fixed payment per enrollee.  42 U.S.C. § 1396b(m); 42 C.F.R. §§ 438.2, 438.6; N.Y. Pub. Health L. § 4403-f.

26.     By definition, a MCO must make medical services available to its enrollees to the same extent as services are made available to other Medicaid recipients in the same area who are not enrolled in the plan.   42 U.S.C. § 1396b(m)(1)(a)(i).

27.     In approving the Partnership Plan, CMS expressly provided that, with the exception of three enumerated provisions of the Medicaid Act not relevant here, "[a]ll requirements of the Medicaid program expressed in law, regulation, and policy statement" continue to apply to New York's Medicaid program. *See* Centers for Medicare & Medicaid Services, Partnership Plan Section 1115 Demonstration, Waiver No. 11-W-00114/2, Waiver Authority at 1 (as of April 14, 2014) ("Waiver Authority"); *available at*: https://www.health.ny.gov/health_care/medicaid/redesign/docs/2015-10-01_1115_waiver_stcs.pdf (last visited Jan. 19, 2016).

28.     Pursuant to the Partnership Plan, in New York, Medicaid recipients who (a) receive Medicare in addition to Medicaid; (b) are eligible for "community based long term care" and (c) are expected to need at least 120 days of such care, must enroll in MLTC plans with which New York has contracted for provision of either home care services or nursing home placement. *See* Waiver Authority at 9 (Special Terms and Conditions).

29.     As of 2013, DOH policy defines "community based long term care" as including Instrumental Activities of Daily Living (e.g. housekeeping tasks) *and* Activities of Daily Living (e.g. bathing, grooming, toileting etc).  DOH, Office of Health Insurance Programs, MLTC Policy 13.15, *available at*: https://www.health.ny.gov/health_care/medicaid/redesign/docs/policy_13_15_refining_definitio n.pdf (last visited Jan. 19, 2016) ("MLTC Policy 13.15").

30.     All MLTC plans are MCOs.  There are two different kinds of MLTC plan: those that are partially capitated, such as Senior Health Partners, and those that are fully capitated, such as Healthfirst CompleteCare.

31.     Partial capitation means that Defendant Zucker contracts with the MLTC to provide certain Medicaid-funded services, including home care services, and in exchange Defendant Zucker pays the MLTC a fixed amount per enrollee without regard to the number of hours of home care the MLTC provides.  *See* N.Y. Pub. Health L. § 4403-f.  Enrollees in a partial capitation plan receive their other Medicaid-funded medical services, such as basic outpatient care, on a fee-for-service basis.

32.     Full capitation means that Defendant Zucker contracts with the MLTC to provide all Medicaid-funded and Medicare-funded services, including home care services, and in exchange Defendant Zucker pays the MLTC a fixed amount per enrollee without regard to the number of hours of home care the MLTC provides. Enrollees in a full capitation plan receive all of their medical services through their MLTC plan.

33.     Healthfirst CompleteCare is a fully-capitated MLTC known as a Medicare Advantage Plan ("MAP").

34.     Whether a plan is fully or partially capitated, it provides the same Medicaid-funded home care services and is subject to the same federal and state requirements regarding timely and adequate notice and standards for reduction of care.

35.     Federal regulations require New York to include certain provisions in all contracts with MLTCs to provide Medicaid-funded services, including the requirement that MLTCs comply with all applicable laws.  42 C.F.R. §§ 438.202, 438.210(a).

36.     The contracts must further ensure "that the services are sufficient in amount, duration, or scope to reasonably be expected to achieve the purpose for which the services are furnished." 42 C.F.R. § 438.210(a)(3)(i).

37.     Additionally, State contracts with MLTCs must "specify what constitutes 'medically necessary services' in a manner that—(i) Is no more restrictive than that used in the State Medicaid program as indicated in State statutes and regulations, the State Plan, and other State policy and procedures." 42 C.F.R. § 438.210(a)(4)(i).

38.     Pursuant to their contracts with the State, MLTCs provide care and services to adult recipients of Medicaid and Medicare who need more than 120 days of long term care services and meet certain other eligibility requirements. *See* MLTC Partial Capitation Model Contract at 16, *available at* https://www.health.ny.gov/health_care/medicaid/redesign/docs/mrt90_partial_capitation_model.pdf; *see also* MAP Model Contract at 33, *available at* https://www.health.ny.gov/health_care/managed_care/mltc/pdf/map_model_contract.pdf.

39.     The services that MLTCs provide pursuant to these contracts include long-term care services that enable Medicaid recipients to live safely in their homes that are collectively referred to herein as "home care services."

40.     Home care services include, at a minimum, the personal care services essential to the maintenance of the patient's health and safety in his or her home, which can include preparing meals, assistance with personal hygiene, toileting, walking, and/or other identified tasks. 42 U.S.C. § 1396d(a)(24); 42 C.F.R. § 440.167; N.Y. Soc. Serv. L. § 365-a(2)(e); N.Y. Comp. Codes R. & Regs. tit. 18 § 505.14(a)(1), (a)(6)(ii)(a).

41.     Home care services also include full or part time nursing, home health aide services, medical supplies, and home-based physical therapy.  42 U.S.C. § 1396d(a)(7); 42 C.F.R. § 440.70; N.Y. Soc. Serv. L. §§ 365-a(2)(d), 367-j; N.Y. Comp. Codes R. & Regs. tit. 18 § 505.23, N.Y. Comp. Codes R. & Regs. tit. 10 § 763.5.

42.     State law requires that the assessment "shall include, but not be limited to, an evaluation of the medical, social and environmental needs of each prospective enrollee in such program. This assessment shall also serve as the basis for the development and provision of an appropriate plan of care for the prospective enrollee." N.Y. Pub. Health L. § 4403-f(7)(g)(i).

43.     Defendant Zucker requires MLTCs to arrange for assessments and reassessments. *See* DOH, Office of Health Insurance Programs, MLTC Policy 13.09  (April 26, 2013), *available at* https://www.health.ny.gov/health_care/medicaid/redesign/docs/policy_13_09_transition_of_saa m_to_uas.pdf.

44.     Defendant Zucker directs MLTCs to use a Uniform Assessment tool designed by the State, and to conduct assessments in the manner specified by Defendant Zucker.  *See id; see also* DOH, Office of Health Insurance Programs, MLTC Policy 13.09(a) (September 24, 2013), *available at* https://www.health.ny.gov/health_care/medicaid/redesign/docs/policy_13a_09_transition_of_sa am_to_uas.pdf.

45.     State law establishes two levels of care for Medicaid recipients' home care services.  N.Y. Soc. Serv. Law § 365-a(2)(e)(iv),  N.Y. Comp. Codes R. & Regs. tit. 18 § 505.14.  Medicaid recipients who need only "nutritional and environmental support" services,

such as making and changing beds and washing dishes, receive "Level I" services. N.Y. Comp. Codes R. & Regs. tit. 18 § 505.14(a)(i); *see* N.Y. Soc. Serv. Law § 365-a(2)(e)(iv).

46.   State law provides that recipients who receive only Level I services may not receive more than eight hours per week of home care. N.Y. Soc. Serv. Law § 365-a(2)(e)(iv), N.Y. Comp. Code R. & Regs. tit. 18 §505.14.

47.   "Level II" services include both the nutritional and environmental support services available in Level I and "personal care functions," such as toileting, walking, feeding, and other specified care services. N.Y. Comp. Code R. & Regs. tit. 18 § 505.14(a)(ii).

48.   In order to be eligible for MLTC, enrollees must need both Level I and Level II services and therefore the eight-hour limit on Level I home care services is never applicable to MLTC enrollees. DOH, Office of Health Insurance Programs, MLTC Policy 13.15.

49.   Defendant Zucker retains the responsibility for ensuring that the rights of Medicaid recipients enrolled in MLTCs are protected. 42 C.F.R. § 438.100(a), (d).

50.   To that end, federal law requires Defendant Zucker to supervise the activities of MLTCs that provide Medicaid-funded services to New Yorkers, including by auditing MLTCs' records and patient files. *See e.g.*, 42 C.F.R. §§ 438.204(b), 438.416, 438.228(b).

51.   Federal law further requires Defendant Zucker to establish intermediate sanctions that he may use against MCOs if Defendant Zucker determines that an MCO "[f]ails substantially to provide medically necessary services that the MCO is required to provide, under law or under its contract with the State, to an enrollee covered under the contract...." 42 C.F.R. § 438.700(a), (b).

**D.     *Medicaid Recipients' Notice and Appeal Rights***

52.     Federal law mandates that Medicaid recipients have the opportunity to challenge any proposed reduction of Medicaid benefits in an administrative fair hearing, and to make that right meaningful, they have a right to timely and adequate notice of their right to such a fair hearing.  42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§, 431.206(b),(c), 431.210, 431.211, 435.919, 435.912,438.10, 438.210(c), (d), 438.404(b); *accord* N.Y. Soc. Serv. Law §§ 22, 365-a(8); N.Y. Comp. Codes R. & Regs. tit. 18 §§ 358-2.2, 358-2.23, 358-3.3.

53.     Federal law requires that Medicaid recipients be sent a written notice of a proposed termination or reduction of home care services explaining the action, the reasons for the action, the right to appeal, the procedures for appealing, how to request expedited resolution, and the right to continuation of services pending the appeal.  42 C.F.R. §§ 431.206, 438.404(a).

54.     These notices must be sent to Medicaid recipients at least ten days before the proposed action is taken.  42 C.F.R. §§ 431.211, 438.404(c)(3).

55.     A Medicaid recipient who timely requests a fair hearing to challenge an adverse determination is entitled to receive his or her benefits unchanged (this entitlement is referred to as "aid-continuing" or "aid-to-continue") until a Decision After Fair Hearing is issued.  42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.230(a), 431.231(c), 438.420(b); N.Y. Soc. Serv. Law § 365-a(8);  N.Y. Comp Codes R. & Regs. tit. 18 §§ 358-3.6, 505.23(d).

56.     MLTC enrollees have the right to both an internal appeal and a Fair Hearing. The internal appeal is conducted by the MLTC itself.

57.     Medicaid recipients enrolled in a partial capitation MLTC such as Senior Health Partners have the option of requesting an internal appeal as well as, and simultaneous to,

requesting a fair hearing. These recipients can receive aid-continuing only if they request a fair hearing.

58.     Medicaid recipients enrolled in a MAP plan such as Healthfirst Complete Care *must* request an internal appeal as a precondition to requesting a fair hearing. These recipients are entitled to aid-continuing during the pendency of their internal appeal. If their internal appeal is not decided fully favorably to them, they may request a fair hearing and are entitled to aid-continuing during the fair hearing process as well.

59.     Medicaid recipients enrolled in a MAP plan are entitled to a ten day advance notice of an initial adverse action and another ten day advance notice if their internal appeals are not fully favorable.

60.     Medicaid recipients who request Fair Hearings have a right to receive, at a reasonable time before the hearing, copies of all documents and records used as a basis for the decision. 42 C.F.R. § 431.242(a)(2). These documents are sent in what is referred to in New York as the "Evidence Packet."

61.     Defendant Zucker's contracts with Healthfirst Defendants require them to send timely and adequate notices of termination and reduction in home care services.

62.     On July 1, 2015, Defendant Zucker issued a formal policy statement requiring partial-capitation MLTCs that intend to reduce or terminate home care services to notify the Medicaid recipient of that proposed action using a form notice drafted by the Department of Health.

63.     Upon information and belief, Defendant Zucker excuses partial-capitation MLTCs from this requirement at their request.

64.     Defendant Zucker has delegated to Defendant Roberts the responsibility to conduct fair hearings, including the responsibility to timely order aid-continuing .

65.     Defendant Roberts processes requests for fair hearings, schedules fair hearings, hold fair hearings, assigns hearing officers to conduct fair hearings, and issues recommended decisions.

66.     A designee of Defendant Zucker signs and issues Decisions After Fair Hearing.

## CLASS FACTS AND ALLEGATIONS

67.     Named Plaintiffs Olga Caballero, Jie Du, by her next friend Michael Tong, and Alejandra Negron, bring this action, pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of themselves and as representatives of a class of:

> All current and future Medicaid recipients who receive home care services through Healthfirst Defendants' MLTCs and who have suffered or will suffer threatened or actual reductions of their home care services without timely and adequate notice, and / or based on arbitrary limits on care.

68.     Members of the proposed class depend on Medicaid-funded home care services provided through the Healthfirst Defendants and given by an aide or nurse in order to remain safely in their own homes.  In many cases these individuals would have to permanently reside in a Medicaid-funded nursing home or other institution if not for their home care services.

69.     Pursuant to his obligations under the Medicaid Act and its implementing regulations, Defendant Zucker's contracts with Healthfirst Defendants require Healthfirst Defendants to comply with the Medicaid Act and its implementing regulations and state law and regulations in their processes to assess, authorize, provide, deny, reassess, reauthorize, increase, reduce, terminate and discontinue Medicaid-funded home care services for all Medicaid recipients receiving home care services through Healthfirst Defendants. *See* MLTC Partial-Capitation Contract Art. II; MAP Model Contract § 14.3(h)

70.     The class is so numerous that joinder of all class members in this action would be impracticable.  Over 10,000 individuals receive Medicaid-funded home care services through Healthfirst Defendants' MLTC plans.

71.     It would be impracticable for potential plaintiffs, who are, by definition, disabled and indigent individuals, to obtain legal services on an individual basis for their claims.  Hence, their rights under the law may well be meaningless without certification of a class action seeking common redress.

72.     Members of the class, all of whom need home care services in order to live safely in the community, are very vulnerable.  By definition, they cannot manage alone. They have multiple chronic conditions, many of which are degenerative - and do not improve - such as dementia and osteoarthritis, and require home care services for basic activities of daily living including ambulation, toileting, and cooking.

73.     Defendant Zucker pays the Healthfirst Defendants a set monthly rate per each individual Medicaid recipient enrolled in their programs.  This rate does not change depending on the amount of care the recipient needs or is given.

74.     This capitated rate creates a perverse incentive for Healthfirst Defendants:  the less care they provide to each individual, the more they earn.

75.     Healthfirst Defendants make decisions about enrollees' needs for care through an assessment process in which a registered nurse goes to the home of an enrollee to examine the enrollee and ask questions.

76.     As part of the assessment, the nurse generally completes at least three specific documents which are subsequently reviewed by an associate medical director who renders a decision about the amount of care to authorize.

77.    Those three documents are a Uniform Assessment System (UAS), a Supplemental Nursing Assessment, and an Aide Task Service Plan (ATSP).

78.    The UAS is a form created by Defendant Zucker, to be completed by an assessing nurse, that is intended to represent a comprehensive assessment of an individual's medical condition and need for assistance.

79.    The Supplemental Nursing Plan is a Healthfirst form, and is intended to supplement the UAS.  In many respects it is duplicative of the UAS, although it does capture some additional information, especially regarding an enrollee's social circumstances.  For example, it contains information about the enrollees' home and informal caregivers.

80.    The ATSP is a Healthfirst form.  It is broken down by task, by day, and by minute, so that the assessing nurse can hypothetically determine how much time it will take to perform each task, each day, and each week.

81.    All of these documents are reviewed by the associate medical director who makes the final determination and signs the notice informing the enrollee of any proposed changes.

82.    The assessment documents are not sent with the notice of proposed reduction.

83.    An enrollee cannot see these documents unless she requests a fair hearing, and then requests the evidence packet.,.

84.    On its face, the ATSP contains limits on the amount of care that can be authorized for various tasks.  There are a maximum number of times a particular task can be performed per day,and a maximum amount of time that can be allotted for each time it is performed.

85.     There are directions for completion of the ATSP. These directions permit the nurse to increase the maximum number of times per day that a task can be performed under certain circumstances to a higher, but specific maximum.  For example, the normal maximum number of times per day an aide can assist an enrollee with toileting is 3, but the instructions indicate that if the person is incontinent the nurse may increase the maximum to 6.

86.     While there are circumstances in which the nurse can increase the daily frequency of tasks, there are no circumstances in which the nurse can increase the maximum amount of time it may take to perform each task, even though the time it takes to perform many tasks such as assisting the enrollee in dressing, bathing, and walking, will depend on the abilities of the enrollee.

87.     The ATSP has no mechanisms for accounting for the span of time between tasks. For example, if an enrollee is provided the maximum time for daily toileting, 60 minutes, those 60 minutes are lumped together with all the other tasks that the person needs into a single block of time.  It does not account for the fact that the individual's need for assistance with toileting will inevitably come up at unpredictable times over the course of the entire day and night.

88.     Healthfirst Defendants have a practice of threatening to reduce or reducing the number of hours of home care services provided to recipients based on, among other things, arbitrarily restricting the duration of time that can be authorized to perform each task, as well as the number of times the task may be performed each day or each week.

89.     Healthfirst Defendants have a custom and practice of threatening to reduce or reducing hours of home care because they will not authorize "span of time" care that allows aides to be present to assist people with tasks, like toileting, that cannot be scheduled. Healthfirst Defendants allocate a total number of minutes for assistance with toileting as part of

the total number of hours of home care services it will provide. An individual who needs assistance with toileting, however, needs such assistance throughout a twenty-four hour period rather than for any given number of minutes in a single block of time.

90.     Healthfirst Defendants have a custom and practice of reducing the amount of time they authorize for aides to perform specific tasks to amounts that are wholly inadequate. For example, SHP has authorized just two hours per week for an aide to prepare, cook, and clean up all 21 of Ms. Negron's meals, which works out to less than six minutes per meal.

91.     Healthfirst Defendants have a custom and practice of improperly limiting the amount of all "Level I" services they provide to their members to 8 hours per week, including meal preparation, all housecleaning and other housework, all grocery and other errands and shopping such as pharmacy shopping, and escorting to medical appointments.

92.     Healthfirst Defendants have a custom and practice of threatening to reduce and reducing the amount of care provided to recipients without providing timely and adequate notice as required by federal and state law.

93.     Healthfirst Defendants have a custom and practice of failing to send notice in time to allow recipients ten days to request a Fair Hearing and aid continuing before the threatened reduction will take place.

94.     Healthfirst Defendants have a custom and practice of sending notices that threaten to reduce or of reducing care on the grounds that the prior, higher, amount of care was mistakenly authorized even though no mistake was ever made.

95.     Healthfirst Defendants have a custom and practice of sending notices that threaten to reduce or of reducing care in notices that mislead recipients about their ability to

successfully challenge proposed reductions by inaccurately describing the reductions as being required by rules and regulations.

96.     For example, when Healthfirst Defendants send notices that threaten to reduce care on the grounds that the prior amount of care was based on a mistake, Healthfirst Defendants cite New York State regulations in support of their allegation of mistake, even though the cited regulations do not support the allegation.

97.     Healthfirst Defendants have a custom and practice of sending notices to members of the class that state that they are reducing hours for particular tasks, such as meal preparation, because the hours spent on such tasks "should be considered part of the housekeeping support."

98.     This statement in the notices is always false and misleading because whether meal preparation should be considered part of the housekeeping support is not relevant to any legitimate calculation of how long meal preparation takes.

99.     Healthfirst Defendants have a custom and practice of reducing the home care services of Medicaid recipients whose medical condition is the same or worse than it was in the previous authorization.

100.    An Associate Medical Director of Healthfirst signs all notices advising recipients enrolled in Senior Health Partners or Healthfirst CompleteCare that Healthfirst Defendants have determined that coverage for home care service will be reduced.

101.    , Defendant Zucker conducted trainings for partial-capitation MLTCs on the proper use of the model notice, including training on how to complete the model notice.

102.    Defendant Zucker's training of partial-capitation MLTCs contained specific instructions on how to fill out the model notice when the basis for reduction was "change in

medical condition," among other things, but did not contain such instructions when the basis for reduction is "prior mistake."

103.   Defendant Zucker knows that Healthfirst Defendants are engaging in the practices described above.

104.   For example, Defendant Zucker has issued Decisions After Fair Hearing in hundreds of cases in which Healthfirst Defendants have reduced home care services without sending timely or adequate notices.

105.   Defendant Zucker obtains information about problems with Medicaid-funded home care services provided by Healthfirst Defendants through enrollee-facing methods including complaint hotlines run by Defendant Zucker and an independent ombudsman program funded by Defendant Zucker.

106.   Defendant Zucker knows or should know that Healthfirst Defendants arbitrarily limit home care services to recipients.

107.   Upon information and belief, Defendant Zucker has received a large number of complaints about Healthfirst Defendants' improper threats to reduce care and actual reductions of care, including reductions with improper notices, through his complaint hotlines and the independent ombudsman program.

108.   Defendant Zucker has failed to take effective action to compel Healthfirst Defendants to comply with their obligations under their contracts and pursuant to the relevant federal and state statues, regulations, and due process requirements.

109.   Defendant Zucker has failed to take effective action to protect class members' rights under the Medicaid Act, relevant state laws, and the due process clauses of the United States and New York Constitutions.

110.    Defendant Zucker has a custom and practice of failing to ensure that Healthfirst Defendants send timely and adequate notices when threatening to reduce or reducing home care services.

111.    Defendant Zucker has a custom and practice of failing to ensure that Healthfirst Defendants threaten to reduce or reduce home care services only if they have adequate justification.

112.    Receipt of inadequate and confusing notices, especially those wrongfully describing reductions as required by law and regulations, itself harms vulnerable recipients of home care services, who suffer acute anxiety about the threatened loss of necessary services.

113.    Attending a Fair Hearing requires waiting in lines and passing through two security checkpoints with metal detectors.  Because OTDA schedules numerous hearings for each time slot, it is common for recipients to wait for more than two or three hours for their Fair Hearings to be called.  Eating, drinking, and using a telephone are all prohibited.  There are often lines to use the restrooms, which are rarely clean.  For a person who is disabled, the process of attending a hearing is usually physically uncomfortable and anxiety provoking, and often painful and terrifying.

114.    Defendant Roberts has a custom and practice of failing to process fair hearing requests and failing to issue aid-continuing directives in a timely manner.

115.    It routinely takes Defendant Roberts several days to process requests for fair hearings, and several more days to transmit aid-continuing directives to MLTCs.

116.    As a result, it is common for individuals to request fair hearings to challenge adverse determinations within the time required, but nevertheless to lose their services, at least

temporarily, because of delays in Defendant Roberts' processing of the Fair Hearing request and transmitting aid-continuing directives to the MLTC threatening adverse action.

117.    As a result of the practices described above, there are questions of both fact and law common to the class, including whether Healthfirst Defendants have a systemic custom and practice of threatening to reduce or reducing the home care of their enrollees, without sending timely and adequate notices about the reductions and without legitimate bases for the reductions; whether they have a systemic custom and practice of misleading enrollees about the possibility of successfully challenging proposed reductions by describing them inaccurately as based on rules and regulations; and whether Defendant Zucker is or should be aware of these customs and practices of Healthfirst Defendants but continues to allow and facilitate these systemic customs and practices and whether these customs and practices violate 42 U.S.C.§ 1396a(a)(3); 42 C.F.R. §§ 438.10; 438.210, 438.400-410; 431.211; New York Social Services Law § 22(12); N.Y. Comp. Code R. & Regs. tit. 18 §§ 505.14(b)(5)(v)(c); 358-2-2, 358-2.23, and 358-3.3; and the Due Process Clauses of the 14th Amendment to the United States Constitution, U.S. Const. Amend. XIV, § 1; and of the New York State Constitution, N.Y. Const. Art. I, § 6.

118.    As a result of the practices of Defendant Roberts, as described above, there are questions of both fact and law common to the class as to the claims against him, including whether he has a systemic practice of failing to process Fair Hearing requests and to issue aid-continuing orders in a timely manner, and whether this practice violates 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 438.420, 438.424; New York Social Services Law § 365-a(8);

§ 22(12); N.Y. Comp. Code R. & Regs. tit. 18  § 358-3.6; and the Due Process clauses of the 14th Amendment to the United States Constitution, U.S. Const. Amend. XIV, § 1, and of the New York State Constitution, N.Y. Const. Art. I, § 6.

119.    The claims of Named Plaintiffs Olga Caballero, Jie Du and Alejandra Negron are typical of the claims of the class in that they did not receive timely and adequate notice of the proposed reductions of their home care services; the notices they did receive are misleading in the way they attempt to justify the reductions and allege no changes in condition that would justify the reductions; and they have not had changes in their conditions or circumstances that would justify the threatened reductions.

120.    Olga Caballero; Jie Du, by her next friend Michael Tong; and Alejandra Negron, will adequately represent the interests of the class.  They are members of the proposed class and there are no conflicts of interest between them and other proposed class members in that all proposed class members would benefit by obtaining timely and adequate notice of home care reductions or terminations, and by no longer being subject to misleading and baseless threats to reduce care or to actual wrongful reductions.

121.    Plaintiffs are represented by the New York Legal Assistance Group ("NYLAG"). NYLAG is a public interest law firm with extensive experience in litigating class action cases, including numerous cases involving public benefits, including Medicaid funded home care services.  For example, NYLAG was class counsel in *Shakhnes v. Eggleston*, 740 F. Supp. 2d 602 (S.D.N.Y. 2010) (certifying Rule 23(b)(2) class of Medicaid home health care recipients), *aff'd sub nom Shakhnes v. Berlin*, 689 F.3d 244 (2d Cir. 2012).

122.    A class action is the appropriate method for a fair and efficient adjudication of this matter in that Defendants have acted or refused to act in a manner generally applicable to

the class as a whole and a class action will avoid numerous separate actions by class members that would unduly burden the courts and create the possibility of inconsistent decisions, thereby making final injunctive and declaratory relief appropriate as to the class as a whole.

## FACTS CONCERNING NAMED PLAINTIFFS

**OLGA CABALLERO**

123.     Olga Caballero is a 67 year-old woman who lives alone in Brooklyn and receives Medicaid and Medicare.

124.     Ms. Caballero speaks only Spanish. She does not read or write in Spanish or English.

125.     She suffers from numerous medical conditions including diabetes mellitus, lower back pain, osteoarthritis, asthma, high blood pressure, chronic obstructive pulmonary disease, depression, and dementia.

126.     Because of her medical conditions, Ms. Caballero needs assistance with many of her daily activities, including bathing and getting dressed, cooking, shopping, laundry, cleaning, moving about, toileting and incontinence care.

127.     Ms. Caballero uses a cane and needs the help of her home attendant to help her move around inside her home. Her gait is so unsteady that when she is alone in her apartment, she moves as little as possible for fear of falling.

128.     There is no elevator in Ms. Caballero's building and she cannot navigate the stairs on her own, so she can never leave home without help.

129.     Until October 1, 2015, Ms. Caballero received 35 hours per week of home care services through Senior Health Partners; since then, she has received home care services through Healthfirst CompleteCare.

130.    Ms. Caballero's 35 hours of home care services are provided from 8 am to 3 pm Monday through Friday, which is insufficient to meet her needs. On the weekends, and every afternoon, she is unable to leave her apartment and tries to stay in bed for fear of falling.

131.    Ms. Caballero's family members visit her from time to time, but are unable to do so on a regular basis. Ms. Caballero struggles to keep herself safe and to accomplish necessary daily activities with her authorized 35 hours of home care.

132.    On or about November 2, 2015, Ms. Caballero received a notice stating that Healthfirst CompleteCare would reduce her home care services to eight hours per week effective November 17, 2015, based on an assessment done October 6, 2015.

133.    The notice is signed by Patricia Bronzert, an Associate Medical Director at Healthfirst.

134.    As she is illiterate, Ms. Caballero was unable to read the notice, and had to wait for her social worker to find out what it said.

135.    The November 2, 2015, notice states that the reason for the reduction is that the "requested service" (the amount of care she was actually receiving) is no longer medically necessary. It states:

> We are changing the services you receive to correct a mistake we found in the previous personal care services authorization. You were receiving 10 hours per week of additional services that were not linked to a specific personal care task which were removed. In accordance with NY State regulations and guidelines for Personal Care Assistance, services are intended to provide assistance with specific environmental and nutritional functions as well as activities of daily living. See 18 NYCRR 505.14 (a) (6) and the NYS Personal Care Guidelines released on May 31, 2013. Also, some of your prior hours were based on an overestimation of the time needed for your activities of daily living. You were receiving three (3) hours per week independently for simple meal preparation which is normally included in housekeeping hours. You were also receiving five (5) hours per week for help with incontinence care which you can manage independently. You were also receiving seven (7) hours per week for help with toileting, transferring, walking, and dressing your upper body, all of which you

require supervision only. Therefore, your current assessment is based on your current condition and provides a more accurate amount of time while ensuring your personal care needs are met.

136.    The sum of the reductions specified in the notice is 25 hours. The notice threatened a reduction of 27 hours.

137.    The notice gives the false impression that the reduction is required by New York State regulations.

138.    The notice does not give Ms. Caballero the information needed to provide her with a meaningful basis on which to decide whether to ask for a Fair Hearing or the information needed to defend against the proposed reduction at a Fair Hearing.

139.    The notice contains false factual allegations, misleading references to regulations, and substantive reasons for the reduction that are not legitimate.

140.    The grounds for reduction alleged in the notice are all either false or legally invalid.

141.    The grounds for the reduction alleged in the notice are based not on any changes in her actual condition or needs, but rather on changes in the way that Healthfirst Defendants characterized her needs in their assessments and Aid Task Service Plans. The notice does not provide the information about those changes that is necessary to make a meaningful decision about whether to seek a fair hearing because the notice does not include the assessments and ATSPs containing Healthfirst Defendants' grounds for reducing her hours.

142.    The assessments and ATSPs in the Evidence Packet Ms. Caballero's attorneys obtained show that the proposed reduction was based on arbitrary limits and not on Ms. Caballero's actual needs and that statements in the notice were false.

143.     The statement in the notice that she had been receiving ten hours not linked to a specific task is false, because in a prior assessment, in October 2014, Ms. Caballero was found to need ten hours per week for assistance with ambulation and transferring because of her unsteady gait.

144.     The fact that ten hours were described in the October 2014 assessment as an "additional finding," does not change the fact that the assessment found her to need ten hours for assistance with ambulation and transferring.

145.     Similarly, the notice's assertions that (a) Ms. Caballero's number of home care services was based on an "overestimation of the time needed" and (b) the most recent assessment "provides a more accurate amount of time" are both false and misleading.

146.     Ms. Caballero was assessed in October 2014, March 2015, and October 2015.

147.     The assessment performed in October, 2015, found "no change" from previous assessments in Ms. Caballero's need for assistance with activities of daily living or in her level of self-sufficiency.

148.     Despite the finding that Ms. Caballero's conditions and needs had not changed, each of the three ATSPs provided radically different amounts of time for tasks, both those performed by aides alone and those performed by aides directly assisting Ms. Caballero.

149.     For example, in 2014, the assessment allocated 100 minutes per week to dinner preparation. In March 2015, it allocated 55 minutes per week, and in October 2015, it allocated no time whatsoever to dinner preparation, even though the assessment noted that she needed "extensive assistance" with meal preparation, and there is no indication on the assessment that anyone else had offered to make her dinner. In fact, Ms. Caballero cannot cook on her own.

150.    For another example, the Notice says she needs "supervision" for toilet use. The 2014 ATSP provided 125 minutes per week related to toiletting; the March 2015 ATSP provided 50 minutes; and the October 2015 ATSP provided no time at all.  Ms. Caballero needs her aide's assistance in getting onto the toilet and getting up, dressing herself afterwards, and changing her diapers.

151.    Despite the fact that the nurse who assessed Ms. Caballero in October 2015 found her condition and need for assistance to be unchanged, she recommended that Ms. Caballero's care be reduced from 35 hours per week to 8 hours per week.

152.    Because Ms. Caballero is a MAP enrollee, she was required to file an internal appeal before requesting a fair hearing.  On November 10, 2015, Ms. Caballero's daughter Magalis verbally requested an internal appeal with Healthfirst.  However, Ms. Caballero's hours were reduced shortly thereafter.

153.    Her family was not able to pay her aide privately to stay for the hours that were cut.

154.    Thus, for several weeks, Ms. Caballero was left alone for more extended periods of time. She spent most of her days during those weeks in bed to avoid falling or injuring herself.

155.    Ms. Caballero felt very depressed during the weeks that her care was reduced. She felt helpless. She relied on a friend who was on vacation to help her preparing food and moving about her home, but her friend was only able to provide minimal assistance. Ms. Caballero was not able to clean her home or change her linens, and had asthma flare-ups because of dust in her home. Because she cannot read, she could not pay her bills or her rent by herself..

156. In its decision on the internal appeal, Healthfirst partially upheld its decision to reduce Ms. Caballero's hours of home care services and approved 15 hours of care, but without an effective date.

157. The notice with the appeal decision does not provide sufficient information about the basis for the decision to enable Ms. Caballero to make a meaningful decision about whether to seek a fair hearing.

158. Ms. Caballero's social worker referred her to NYLAG for assistance and NYLAG requested a Fair Hearing for Ms. Caballero on or about December 9, 2015. In mid-December, Ms. Caballero's 35 hours of aid home care services were restored as aid-continuing pending her hearing.

159. Ms. Caballero's Fair Hearing was scheduled for January 6, 2016. However, Ms. Caballero became sick with bronchitis in the first week of January and was not able to attend.

160. On January 5, 2016, her hearing was adjourned; it has not yet been held.

**JIE DU**

161. Jie Du is a 96 year-old woman who lives alone in Brooklyn and receives Medicaid.

162. Ms. Du lives in a basement apartment. Her daughter and son-in-law, who assist with her care, live in an apartment upstairs.

163. She suffers from numerous medical conditions including blindness, dementia, osteoarthritis, and restlessness and agitation, all of which significantly limit her ability to function on her own.

164.     Because of her medical conditions she cannot walk without assistance, and so she needs help with virtually all of her daily activities, including bathing, getting dressed, cooking, shopping, laundry, cleaning, and using the bathroom.

165.     Because of her dementia, she cannot be left alone.  She does not fully understand her own limitations, and recently fell and broke her wrist because she tried to walk around alone in the house without her cane.

166.     Since that fall, her spirits have declined, and she is more and more passive and confused.

167.     Ms. Du receives home care in the amount of 42 hours per week, six hours per day, seven days a week.

168.     Ms. Du struggles to stay safe and to accomplish her necessary daily activities with her authorized 50 hours of home care.  She relies heavily on her daughter and son-in-law to care for her in the evenings and on the weekends, but their jobs and other commitments make it difficult for them to care for her during all the uncovered hours and will make it impossible for them to adequately care for her if her care is reduced further.

169.     In December, 2015, Ms. Du received a notice from Healthfirst Defendants, dated December 15, 2015, stating that her home care services would be reduced from 42 hours per week to 30 hours per week, effective December 30, 2015, based on an assessment done on November 24, 2015.

170.     The notice is signed by Patricia Bronzert, an Associate Medical Director at Healthfirst.

171.    The notice states that the reason for the reduction is that the "requested service" (the amount of care she was actually receiving) is no longer medically necessary. The notice states:

> We are changing the services you receive to correct a mistake we found in the previous personal care services authorization. You were receiving over 3 hours per week for additional services that were not linked to a specific personal care task and were removed. In accordance with NY State regulations and guidelines for Personal Care Assistance, services are intended to provide assistance with specific environmental and nutritional functions as well as activities of daily living. See 18 NYCRR 505.14(a)(6) and the NYS Personal Care Guidelines released on May 31, 2013. You were receiving 5 hours per week for cognitive prompting. Cognitive prompting includes such activities as asking if you remember what day it is today or asking if you remember your address. This activity is considered to be an incidental function, and is not a specific standalone function required to be performed by a personal care assistant. See 18 NYCRR 505.14(a)(6). Also, some of your prior hours were based on an overestimation of the time needed for your activities of daily living. You were receiving over 4 hours per week independently for simple meal preparation which should be considered part of the Level 1 support time.

172.    The notice gives the false impression that the reduction is required by New York State regulations.

173.    The notice does not give Ms. Du the information needed to provide her with a meaningful basis on which to decide whether to request a Fair Hearing or the information needed to defend against the proposed reduction at a Fair Hearing.

174.    The notice contains false factual allegations, misleading references to regulations, and substantive reasons for the reduction that are not legitimate.

175.    The grounds for the reduction alleged in the notice are not based on any changes in her actual condition or needs, but are only based on changes in the way that Healthfirst characterized her needs in their assessments and ATSPs, but Ms. Du could not know that because the assessments and ATSPs are not provided with the notice.

176.    Despite the inadequacies in the notice, Ms. Du's son-in-law contacted NYLAG and obtained help.  Ms. Du's attorneys requested and received the Evidence Packet containing the assessments and ATSPs.

177.    These documents show that the reasons for the reduction given in the notice are not supported by the assessments on which they purport to be based.

178.    The assessments and ATSPs in the Evidence Packet show arbitrary changes in the amounts of time Ms. Du is said to need care; the changes are clearly not based on changes in her condition.

179.    The assessments and ATSPs reveal that the grounds for the reduction alleged in the notice are false and misleading.

180.    For example, the notice asserts that 3 hours were incorrectly approved because they "were not linked to a specific personal care task."  It is true that the July 22, 2014 assessment provided for 3 hours per week based on an "additional finding," rather than a specific task, however the nurse noted that the reason for these additional hours was Ms. Du's blindness, a fact that significantly adds to the time it takes for her aide to help her with each task.

181.    The notice states that 5 hours would be removed because they were provided for "cognitive prompting" characterizing that incorrectly as  "asking you if you remember what day it is and if you remember your address." In fact, cognitive prompting consists of providing a patient with the necessary verbal and physical cues to enable them to participate in their activities of daily living as much as possible, and is necessary for Ms. Du because of her blindness and dementia.

182.    Prior to the November 24, 2015 assessment Ms. Du was assessed on July 2, 2015,  January 13, 2015, and July 23, 2014.

183.    In the November 24, 2015 assessment, the nurse found that Ms. Du's status had declined and her overall self-sufficiency had deteriorated.

184.    Despite the fact that the nurse found her condition to have deteriorated and declined, she recommended that Ms. Du's care be reduced from 42 hours per week to 30 hours.

185.    The November 24, 2015 ATSP authorizes less time for ambulation, transferring, and toileting than either the July 22, 2014 or the January 13, 2015 ATSP, without providing any explanation for how or why these needs could now be met in less time than was previously authorized.

186.    None of the assessments take into account the span of time during which assistance with toileting and ambulation is needed or the fact that toileting cannot be scheduled.

187.    The November 2015 ATSP removes all the time previously given for dinner preparation and dinner feeding.

188.    Because of her blindness, dementia, and weakness, Ms. Du cannot prepare meals or feed herself.

189.    Prior to threatening to this reduction in Ms. Du's care, Healthfirst Defendants did not ask her family members whether they are willing and able to prepare dinner and feed Ms. Du.

190.    Ms. Du's daughter and son-in-law are willing and able to take care of Ms. Du some of the time, but because of their work schedules, they are unable to care for her enough to make it possible for her to be safe with only 30 hours of care from Healthfirst.

191.    Because of their work schedules they are unable to guarantee that they are available to prepare dinner and feed it to Ms. Du.

192.    There has been no change in Ms. Du's condition or circumstances that would justify a reduction of her hours of care.

193.    Despite the deficiencies in Ms. Du's November 2015 notice from Healthfirst Defendants, Ms. Du's son-in-law timely requested a Fair Hearing on December 22, 2015, less than 10 days before the reduction was to go into effect, and requested aid continuing.

194.    Because Ms. Du requested the Fair Hearing and aid continuing in a timely manner, she should have been able to count on the continuation of her care at 42 hours per week.

195.    However, on December 28 or 29, Ms. Du's family was told that starting December 30, her care would be reduced to 30 hours per week because there had been no order from Defendant Roberts to continue to provide 42 hours of care per week pending the decision after Ms. Du's Fair Hearing.

196.    When Ms Du's attorneys at NYLAG contacted Defendant Roberts, on December 29, 2015, seven days after Ms. Du requested the Fair Hearing and aid continuing, Defendant Roberts' staff acknowledged that they had received the aid-continuing request on December 22, but had not yet sent the order to SHP. They said Ms. Du might just have to manage without aid-continuing for a couple of days.

197.    When Ms. Du's attorney called Defendant Roberts' staff a second time on December 29, 2015, she was told they had just sent the aid-continuing order for Ms. Du to SHP.

198.    Ms. Du's Fair Hearing  has not yet been held.

## ALEJANDRA NEGRON

199.    Alejandra Negron is a 71 year-old woman who lives alone in Manhattan and receives Medicaid and Medicare.

200.    She suffers from numerous medical conditions including severe asthma, emphysema, COPD, diabetes, osteoporosis, osteoarthritis, chronic pain, and coronary artery disease.

201.    Because of her medical conditions she cannot walk without help, so she needs assistance with virtually all of her daily activities, including bathing, getting dressed, cooking, shopping, laundry, cleaning, using the bathroom.

202.    Ms. Negron's arthritis is particularly bad in her fingers and her left knee.  Her fingers appear curled and twisted, and she is unable to perform simple tasks like opening a jar or holding a pot.  She cannot prepare even simple meals, and without the assistance of an aide or family member eats only a piece of bread.

203.    She is also unable to bend her left knee due to her arthritis, which causes significant balance problems when she attempts to stand or walk.  When she fell in her apartment in 2014, it took over an hour for her daughter and the doorman in her building to get her back on her feet.  Ms. Negron is afraid of falling again and therefore tries not to get up when she is alone in the apartment.

204.    Ms. Negron takes a number of medications for her diabetes, including a diuretic that results in her having to use the bathroom one to three times per hour.  She requires assistance with changing her pull-ups and pulling up her pants because she cannot bend forward sufficiently to complete these tasks and because she has limited mobility in her left arm.  She

also has a collapsible trachea and is in danger of breathing problems if she bends forward to attempt these tasks on her own.

205.   Ms. Negron's diabetes medication must be taken on a strict schedule and must always be taken with food.  As a result, she must eat regular meals and snacks throughout the day.

206.   Ms. Negron has a hard mass on her left shoulder that impedes movement of her arm.  As a result, she cannot lift her arm to complete tasks such as opening a cupboard or washing her hair.

207.   Prior to January of 2015, Ms. Negron received 55 hours per week of home care services.

208.   In January, 2015, Ms. Negron learned that Healthfirst Defendants had decided to reduce her home care services to fifty hours per week.  She was verbally told it was because SHP did not want to pay the aide overtime.  She received no notice and did not know of her right to a fair hearing, so she was unable to challenge the reduction and her hours were reduced.

209.   Between January of 2015, and November of 2015, Ms. Negron continued to receive fifty hours per week of home care, eight hours per day Monday through Friday and five hours on Saturday and Sunday.

210.   Ms. Negron's daughters and granddaughter provide her with additional care in the evenings and weekends, but they are unable to care for her during the day because of their work.

211.   Ms. Negron struggles to accomplish all of her daily activities with her authorized 50 hours of home care.  She relies heavily on her daughters and granddaughter to care for her in

the evenings and on the weekends, and when they are unable to arrive before her aide's shift ends, she remains in her bed until her family arrives.

212. On or about November 29, 2015, Ms. Negron received a notice from Healthfirst Defendants.

213. The notice was dated November 18, 2015, but arrived in an envelope postmarked November 21, 2015.

214. The notice stated that Ms. Negron's home care services would be reduced from 50 hours per week to 25 hours per week, effective December 3, 2015, based on an assessment conducted on October 15, 2015.

215. The notice is signed by Patricia Bronzert, an Associate Medical Director at Healthfirst.

216. The notice states that the reason for the reduction is that the "requested service" (actually the amount of care she was already receiving) is no longer medically necessary, and that the change is to correct a mistake in the previous personal care services authorization. The notice states:

> We are changing the services you receive to correct a mistake we found in the previous personal care services authorization. The 14 hours per week of additional services that you were receiving, which were not linked to a specific personal care task, were removed. In accordance with NY State regulations and guidelines for Personal Care Assistance, services are intended to provide assistance with specific environmental and nutritional functions as well as activities of daily living. See 18 NYCRR 505.14(a)(6) and the NYS Personal Care Guidelines released on May 31, 2013. Also, some of your prior hours were based on an overestimation of the time needed for your activities of daily living. You were receiving over 7 hours per week independently for simple meal preparation, which should be considered part of the housekeeping support. Your current assessment is based on your current condition and provides a more accurate amount of time while ensuring your personal care needs are met. After review of all the information, including the most current assessment, as outlined below, Healthfirst is changing the service you currently receiving (sic). We are approving a total of 25 hours per week for personal are (sic) assistance support.

217. The sum of the reductions specified in the notice is 21 hours. The notice threatened a reduction of 25 hours.

218. The notice gives the false impression that the reduction is required by New York State regulations.

219. The notice does not give Ms. Negron the information needed to provide her with a meaningful basis on which to decide whether to ask for a Fair Hearing or with the information needed to adequately defend against the proposed reduction at a Fair Hearing.

220. The notice contains false factual allegations, misleading references to regulations, and substantive reasons for the reduction which are not legitimate..

221. The grounds for the reduction alleged in the notice are not based on changes in her actual condition or needs, but only on the way that Healthfirst Defendants characterized her needs in their assessments and ATSPs, but Ms. Negron could not know that when she received the notice because the assessments and ATSPs are not provided with the notice.

222. The assessments and ATSPs in the Evidence Packet obtained by Ms.Negron's attorneys show that the proposed reduction was based on arbitrary limits and not on Ms. Negron's actual needs and that statements in the notice were false.

223. The grounds for reduction alleged in the notice are all either false or legally invalid.

224. The statement in the notice that she had been receiving 14 hours not linked to a specific task is false. In a prior assessment, in March 2015, Ms. Negron's authorized 50 hours per week were all linked to specific tasks like meal preparation, cleaning, personal hygiene, grocery shopping, errands, walking, and toileting. In fact, that assessment found that she

required 52.75 hours of care per week, all linked to specific tasks, but she was authorized to receive only 50 hours per week.

225.     Additionally, the notice's claim that "you were receiving over 7 hours per week independently for simple meal preparation, which should be considered part of the housekeeping support" is both false and misleading.

226.     Ms. Negron was assessed on March 27, 2015, and October 15, 2015.

227.     The assessment performed in March 2015 allocated six hours per week, not seven, for meal preparation. The October 2015 assessment allocated two hours per week for this task, for a total reduction of four hours per week for meal preparation.

228.     The notice suggests that seven hours of the proposed reduction are due to a misallocation of meal preparation time, but in fact only four hours were removed for the meal preparation task. The notice does not explain from what other task the remaining three hours would be removed.

229.     Even if the notice's assertions regarding the seven hours of meal preparation were factually correct, the fact that these tasks "should be considered part of the housekeeping support" is not a rational basis for a reduction as there is no allocation of time for a category of "housekeeping support" in any of the assessments.

230.     Similarly, the notice's assertions that (a) Ms. Negron's number of home care services was based on an "overestimation of the time needed" and (b) the most recent assessment "provides a more accurate amount of time" are both false and misleading. The assessment performed in October 2015 found that Ms. Negron's condition had "declined" and that her overall self-sufficiency had "deteriorated" since the March 2015 assessment.

231.    Despite the fact that the nurse who assessed Ms. Negron's condition found that her condition had deteriorated, she recommended that Ms. Negron's care be reduced from 50 hours per week to 16.63 hours on the ATSP.   This reduction involves radical reductions to the time allocated for individual tasks without any explanation of how the tasks can be completed.

232.    While the October assessment recommends 16.6 hours of care per week, the November notice Ms. Negron received notifies her of a reduction to 25 hours per week.  This discrepancy, explained nowhere in the evidence packet,  makes it difficult for Ms. Negron to adequately prepare for her Fair Hearing.

233.    For example, the March assessment allocated 83 minutes per week for the preparation of breakfast.  The October assessment allocated zero minutes for this task.  The assessment contains no explanation of how or whether Ms. Negron will eat breakfast if the reduction goes into effect.

234.    For another example, both the March assessment and the October assessment state that Ms. Negron's gait and balance are "unsteady."  The March assessment allocates 420 minutes per week for assistance with locomotion indoors.  The October assessment allocates only 70 minutes per week, or 10 minutes per day, for this task.  There is no explanation for how Ms. Negron will be able to manage even the most basic movements around her apartment, such as from her bedroom to her kitchen at mealtime, in only ten minutes per day.

235.    The March assessment allocated 630 minutes per week for toileting and 420 minutes per week for transfers on and off of the toilet.  The October assessment allocated only 70 minutes per week, or 10 minutes per day, for each of these tasks.  Ms. Negron requires assistance with toileting and transfers to the toilet throughout the day well in excess of 20

minutes per day.   In fact, she uses the bathroom one to three times per hour and requires assistance with her pull-ups and dressing on each of those occasions.

236.    Neither the March assessment nor the October assessment documents consider the fact that toileting cannot be done all within one short period, but must be done over a span of time, and it cannot be scheduled.  Both assessments simply assign an amount of daily time to that task without regard to the fact that the need for assistance with the task naturally arises at unpredictable times around the clock.

237.    On December 3, 2015, Ms. Negron's daughter, Carmen Hernandez, requested a fair hearing by a telephone call to OTDA and was verbally informed that OTDA was ordering aid continuing.

238.    Although OTDA ordered aid-continuing that day, their aid-continuing order was not conveyed to Healthfirst Defendants until two days later.

239.    Because OTDA did not convey the aid-continuing directive immediately, Healthfirst Defendants reduced Ms. Negron's care on December 3, 2015.

240.    On December 3, 2015, Ms. Negron's daughter called Healthfirst Defendants to tell them that the State had ordered aid-continuing but they refused to call the State to check and so reduced the care anyway.

241.    Ms. Negron's daughter was able to pay her aide privately to stay the normal hours to prevent her from being left alone.

242.    On December 5, 2015, her care was restored pursuant to the aid-continuing directive.

243.    On December 5, 2015, because of extreme anxiety caused by the fear of losing her care and being institutionalized, Ms. Negron's heart rate escalated so much that she had to go to the emergency room.  She was in the hospital for 3 days.

244.    Ms. Negron has said that if her reduction goes into effect she may consider suicide because she does not want to go to a nursing home but knows that it will be impossible for her to remain safely in her home with only 25 hours of care per week.

245.    Ms. Negron's Fair Hearing regarding the reduction of her home care services has not yet been held.

## FIRST CAUSE OF ACTION
### (*Against Healthfirst Defendants*)

246.    Healthfirst Defendants' custom and practice of threatening to reduce, and of actually reducing, home care services without first providing a timely and adequate notice of such adverse action, violates Plaintiffs' rights under 42 U.S.C.§ 1396a(a)(3) and its implementing regulations at 42 C.F.R. § 431.100 *et seq.* and § 438.100 *et seq.*,; N. Y. Soc. Serv. Law § 22(12) and its implementing regulations; and the Due Process clauses of the 14th Amendment to the United States Constitution, U.S. Const. Amend. XIV, § 1, and of the New York State Constitution, N.Y. Const. Art. I, § 6.

## SECOND CAUSE OF ACTION
### (*Against Defendant Zucker*)

247.    Defendant Zucker's custom and practice of failing to ensure that Healthfirst Defendants provide timely and adequate notices when threatening to reduce or actually reducing home care services, despite his knowledge of Healthfirst Defendants' custom and practice of failing to send such notices, violates Plaintiffs' rights under 42 U.S.C.§ 1396a(a)(3) and its implementing regulations at 42 C.F.R. § 431.100 *et seq.* and § 438.100 *et seq.*,; N.Y. Soc. Serv.

Law § 22(12) and its implementing regulations; and the Due Process clauses of the 14th

Amendment to the United States Constitution, U.S. Const. Amend. XIV, § 1, and of the New

York State Constitution, N.Y. Const. Art. I, § 6.

## THIRD CAUSE OF ACTION
### (*Against Healthfirst Defendants*)

248.    Healthfirst Defendants' custom and practice of threatening to reduce or actually

reducing home care services based on arbitrary limits on care violates Plaintiffs' rights under

the Due Process clauses of the 14th Amendment to the United States Constitution, U.S. Const.

Amend. XIV, § 1, and of the New York State Constitution, N.Y. Const. Art. I, and under Soc.

Serv. Law § 22(12) and its implementing regulations.

## FOURTH CAUSE OF ACTION
### (*Against Defendant Zucker*)

249.    Defendant Zucker's custom and practice of failing to ensure that Healthfirst

Defendants do not threaten to reduce or actually reduce home care services based on arbitrary

limits on care, despite Defendant Zucker's knowledge of Healthfirst Defendants' custom and

practice of doing so, violates Plaintiffs' rights under the Due Process clauses of the 14th

Amendment to the United States Constitution, U.S. Const. Amend. XIV, § 1, and of the New

York State Constitution, N.Y. Const. Art. I, and under N.Y. Soc. Serv. Law § 22(12) and its

implementing regulations.

## FIFTH CAUSE OF ACTION
### (*Against Defendant Roberts*)

250.    Defendant Roberts' practice of failing to timely order aid-continuing when

Plaintiffs timely request Fair Hearings violates Plaintiffs rights under 42 U.S.C. § 1396a(a)(3)

and its implementing regulations at 42 C.F.R. § 431.100 *et seq.* and § 438.100 *et seq.*; N.Y. Soc.

Serv. Law §§ 22(12) and its implementing regulations; and the Due Process clauses of the 14th

Amendment to the United States Constitution, U.S. Const. Amend. XIV, § 1, and of the New

York State Constitution, N.Y. Const. Art. I, § 6.


WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment:

1.      Certifying this case as a class action, pursuant to Rules 23(a) and (b)(2) of the

Federal Rules of Civil Procedure, with the class defined as:

> All current and future Medicaid recipients who receive home care services
> through Healthfirst Defendants and who have suffered or will suffer threatened
> or actual reductions of their home care services without timely and adequate
> notice, and / or based on arbitrary limits on care.

2.      Declaring that:

a.      The Healthfirst Defendants' custom and practice of threatening to reduce,

and actually reducing, home care services without first providing timely and

adequate notice violates Plaintiffs' rights under 42 U.S.C. § 1396a(a)(3) and  its

implementing regulations at 42 C.F.R. § 431.100 *et seq.* and § 438.100 *et seq.*; N.Y.

Soc. Serv. Law § 22(12) and its implementing regulations; and the Due Process

clauses of the 14th Amendment to the United States Constitution, U.S. Const.

Amend. XIV, § 1, and of the New York State Constitution, N.Y. Const. Art. I, § 6.

b.      Defendant Zucker's custom and practice of failing to ensure that the

Healthfirst Defendants provide timely and adequate notice when they threaten to

reduce or reduce home care services, despite Defendant Zucker's knowledge of

Healthfirst Defendants' custom and practice of failing to send such notices, violates

Plaintiffs' rights under 42 U.S.C. § 1396a(a)(3) and its implementing regulations at

42 C.F.R. § 431.100 *et seq.* and § 438.100 *et seq.*; N.Y. Soc. Serv. Law § 22(12) and

its implementing regulations; and the Due Process clauses of the 14th Amendment to

the United States Constitution, U.S. Const. Amend. XIV, § 1, and of the New York State Constitution, N.Y. Const. Art. I, § 6.

    c.    The Healthfirst Defendants' custom and practice of threatening to reduce or actually reducing home care services based on arbitrary limits on care, violates Plaintiffs' rights under the Due Process clauses of the 14th Amendment to the United States Constitution, U.S. Const. Amend. XIV, § 1, and of the New York State Constitution, N.Y. Const. Art. I, and under N.Y. Soc. Serv. Law § 22(12) and its implementing regulations.

    d.    Defendant Zucker's custom and practice of failing to ensure that Healthfirst Defendants do not threaten to reduce or actually reduce Plaintiffs' home care services based on arbitrary limits on care, despite Defendant Zucker's knowledge of Healthfirst Defendants' custom and practice of doing so, violates Plaintiffs' rights under the Due Process clauses of the 14th Amendment to the United States Constitution, U.S. Const. Amend. XIV, § 1, and of the New York State Constitution, N.Y. Const. Art. I, and under N.Y. Soc. Serv. Law § 22(12) and its implementing regulations.

    e.    Defendant Roberts' custom and practice of failing to timely order aid-continuing when Plaintiffs timely request Fair Hearings, violates Plaintiffs' rights under 42 U.S.C. § 1396a(a)(3) and its implementing regulations at 42 C.F.R. § 431.100 *et seq.* and § 438.100 *et seq.*; New York Social Services Law § 365-a(8); New York Social Services Law § 22(12) and its implementing regulations; and the Due Process clauses of the 14th Amendment to the United States Constitution, U.S.

Const. Amend. XIV, § 1, and of the New York State Constitution, N.Y. Const. Art. I, § 6.

3.     Enjoining

    a.     Healthfirst Defendants from threatening to reduce, and actually reducing, home care services without first providing timely and adequate notice;

    b.     Healthfirst Defendant from threatening to reduce or actually reducing home care services based on arbitrary limits to care;

    c.     Defendant Zucker to ensure that Healthfirst Defendants provide timely and adequate notice when they threaten to reduce or reduce home care services;

    d.     Defendant Zucker to ensure that Healthfirst Defendants do not threaten to reduce or actually reduce Plaintiffs' home care services based on arbitrary limits on care;

    e.     Defendant Roberts to timely order aid-continuing when Plaintiffs timely request Fair Hearings;

4.     Awarding reasonable attorney's fees pursuant to 42 U.S.C. § 1988(b);

5.     Awarding costs and disbursements; and

6.     Granting such other and further relief as the Court may deem just and proper.

Dated: January 20, 2016
New York, New York

                NEW YORK LEGAL ASSISTANCE GROUP
                BETH GOLDMAN, ESQ.

                By:

                Jane Greengold Stevens, of counsel
                Michelle Movahed, of counsel
                Benjamin E. Taylor, of counsel
                7 Hanover Square, 7th Floor
                New York, NY 10004

Telephone: (212) 613-5000
Facsimile:  (212) 750-0820
Email:  jstevens@nylag.org
Email:  mmovahed@nylag.org
Email:  btaylor@nylag.org