UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
OLGA CABALLERO; JIE DU, by her next friend MICHAEL
TONG; ALEJANDRA NEGRON; MARIANO VAZQUEZ,
by his next friend IRAIDA VASQUEZ; and JUAN SANTOS,
by his next friend RITA BAEZ, individually and on behalf of
all others similarly situated,

|  |  |
|---|---|
| Plaintiffs, | 16 Civ 00326 (CBA) (CLP) |
| -against- | **FIRST AMENDED CLASS ACTION COMPLAINT** |

SENIOR HEALTH PARTNERS, INC; HEALTHFIRST, INC;
HF MANAGEMENT SERVICES, LLC; HEALTHFIRST
HEALTH PLAN, INC.; XYZ CORPORATIONS 1-10; and
HOWARD ZUCKER, as Commissioner
of the New York State Department of Health,

Defendants.
-------------------------------------------------------------------------x

## PRELIMINARY STATEMENT

1.     Plaintiffs OLGA CABALLERO; JIE DU, by her next friend MICHAEL TONG;

ALEJANDRA NEGRON; MARIANO VAZQUEZ, by his next friend IRAIDA VASQUEZ;

and JUAN SANTOS, by his next friend RITA BAEZ, bring this class action seeking injunctive

and declaratory relief on behalf of themselves and a class of all current and future Medicaid

recipients who receive or will receive Medicaid-funded home care services through Senior

Health Partners or Healthfirst CompleteCare and who have suffered since January 1, 2015, or

who will suffer Defendants' systemic practices of reducing or threatening to reduce, or allowing

reductions of their necessary care without the timely and adequate notice required by law, and

Defendants' systemic practices of basing these reductions on unlawful and arbitrary limits on care.

2.      Defendants Senior Health Partners, Inc., HF Management Services, LLC, Healthfirst Health Plan, Inc., and Healthfirst, Inc. (collectively referred to as the "Healthfirst Defendants") provide a variety of programs through which Medicaid recipients can receive home care services, including the two Managed Long Term Care ("MLTC") plans at issue here: Senior Health Partners and Healthfirst CompleteCare.  These two MLTC plans are available to New York Medicaid recipients in New York City and in Westchester, Nassau, and Suffolk Counties who would be eligible for nursing home admission and who are expected to need long-term care services for at least 120 days.  These plans must provide home care in accordance with Medicaid laws and regulations.

3.      Defendant Zucker is required by law to ensure that all Medicaid recipients in the State receive the services and protections mandated by federal and state laws, regulations and Constitutions.  The contracts between Zucker and Healthfirst Defendants require Healthfirst Defendants to comply with all applicable federal and state laws and regulations.

4.      Since at least January 1, 2015, the Healthfirst Defendants have engaged in systemic practices of threatening to reduce or actually reducing Medicaid-funded home care services based on arbitrary limits and without the timely and adequate notice required by law and Defendant Zucker has systemically failed to ensure that Healthfirst Defendants comply with the Medicaid Act, 42 U.S.C. § 1396 *et seq.*, its implementing regulations at 42 C.F.R. § 431.100 *et seq.* and § 438.100 *et seq.*, the New York State Social Services Law § 22 and its implementing regulations, and the Due Process Clauses of the 14th Amendment to the U.S. Constitution and of the New York State Constitution.

2

5.     Plaintiffs seek injunctive and declaratory relief from Defendants' ongoing violations of the Medicaid Act, 42 U.S.C. § 1396 *et seq.*, its implementing regulations at 42 C.F.R. § 431.100 *et seq.* and § 438.100 *et seq.*, the New York State Social Services Law § 22 and its implementing regulations, and procedural and substantive Due Process rights guaranteed by the 14th Amendment to the U.S. Constitution and of the New York State Constitution.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.  This action is authorized by 42 U.S.C. § 1983 as an action seeking redress of the deprivation of statutory and constitutional rights under color of law.

7.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) because it is the judicial district in which a substantial part of the events giving rise to the claims occurred.

## PARTIES

8.     Named Plaintiff OLGA CABALLERO is a 67 year old woman who lives alone in Brooklyn.  She is a recipient of Medicaid and Medicare, and receives home care services through Healthfirst Defendants.  She was enrolled in Senior Health Partners until October 1, 2015, and thereafter enrolled in Healthfirst CompleteCare.

9.     Named Plaintiff JIE DU is a 96 year old woman who lives alone in Brooklyn, New York.  Michael Tong is her son-in-law and next friend.  She brings this action by her next friend because she cannot adequately represent herself or understand the nature of the claims herein.  She is a Medicaid recipient who receives home care services through the Healthfirst Defendants.  She is enrolled in Senior Health Partners.

10.     Named Plaintiff ALEJANDRA NEGRON is a 71 year old woman who lives alone in Manhattan.  She is a Medicaid recipient who receives home care services through the Healthfirst Defendants.  She is enrolled in Senior Health Partners.

11.     Named Plaintiff MARIANO VAZQUEZ is an 83 year old man who lives alone in Manhattan.  Iraida Vasquez is his niece and next friend.  He brings this action by his next friend because he cannot adequately represent himself or understand the nature of the claims herein. He is a Medicaid recipient who receives home care services through the Healthfirst Defendants.  He is enrolled in Senior Health Partners.

12.     Named Plaintiff JUAN SANTOS is a 93 year old man who lives with his daughter in the Bronx.  Rita Baez is his daughter and next friend.  He brings this action by his next friend because he cannot adequately represent himself or understand the nature of the claims herein.  He is a Medicaid recipient who receives home care services through the Healthfirst Defendants.  He is enrolled in Senior Health Partners.

13.     Defendant SENIOR HEALTH PARTNERS, INC., is a MLTC owned by Defendant HF Management Services, LLC.  It authorizes Medicaid funded home care services to eligible Medicaid recipients.  Upon information and belief, Senior Health Partners also administers Healthfirst CompleteCare, a MLTC that authorizes home care services to Medicaid recipients who are also enrolled in Medicare.  It maintains an office at 100 Church Street, New York, New York.

14.     Defendant HF MANAGEMENT SERVICES, LLC, is the parent corporation of Defendant Senior Health Partners and is responsible for the actions of its subsidiary.  Upon information and belief, HF Management Services, LLC also administers Healthfirst

4

CompleteCare, a MLTC that authorizes home care services to Medicaid recipients who are also enrolled in Medicare.  It maintains an office at 100 Church Street, New York, New York.

15.     Defendant HEALTHFIRST HEALTH PLAN, INC., is a New York corporation that authorizes services to New York state enrollees of both Medicaid and Medicare.  Upon information and belief, Healthfirst Health Plan, Inc. also administers Healthfirst CompleteCare, a MLTC that authorizes home care services to Medicaid recipients who are also enrolled in Medicare.  It maintains an office at 100 Church Street, New York, New York.

16.     Defendant HEALTHFIRST, INC., is the parent corporation of Healthfirst Health Plan, Inc. and is responsible for the actions of its subsidiary.  Upon information and belief, Healthfirst, Inc. also administers Healthfirst CompleteCare, a MLTC that authorizes home care services to Medicaid recipients who are also enrolled in Medicare.  It maintains an office at 100 Church Street, New York, New York.

17.     The Healthfirst Defendants have contracts with Defendant Zucker pursuant to which they share the state's obligation to authorize Medicaid-funded home care services to eligible Medicaid recipients enrolled in their plans.

18.     Defendant HOWARD ZUCKER is the Commissioner of the New York State Department of Health ("DOH"), and as such is responsible for the administration of the Medicaid program in the State of New York.  He maintains an office at Corning Tower, Empire State Plaza, Albany, New York.

## LEGAL FRAMEWORK

19.     The Medical Assistance Program ("Medicaid") is a joint federal-state program established under Title XIX of the Social Security Act ("Medicaid Act") to ensure that

rehabilitation, medical care, nursing, and other services are provided to low-income and indigent people. 42 U.S.C. § 1396 *et seq.*; 42 C.F.R. § 430 *et seq.*

20.     States that elect to participate in the Medicaid program must comply with requirements set out in federal law and regulations to be eligible for federal funds. 42 U.S.C. §§ 1396a, 1396c.

21.     Federal law mandates that Medicaid recipients have the opportunity to challenge any proposed reduction of Medicaid benefits in an administrative fair hearing and, to ensure that the Fair Hearing right is meaningful, recipients also have a right to timely and adequate notice of their right to such a fair hearing. 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.206(b),(c), 431.210, 431.211, 435.919, 435.912, 438.10, 438.210(c), (d), 438.404(b); *accord* N.Y. Soc. Serv. Law §§ 22, 365-a(8); N.Y. Comp. Codes R. & Regs. tit. 18 §§ 358-2.2, 358-2.23, 358-3.3.

22.     The required notice must, among other things:  explain the proposed action; state the reasons for the action; explain the recipient's right to a Fair Hearing; and explain the right to "aid-continuing," which means continuation of their services pending the Fair Hearing. 42 C.F.R. §§ 431.206, 431.210, 438.404(a).

23.     These notices must be sent to Medicaid recipients at least ten days before the proposed action is taken. 42 C.F.R. §§ 431.211, 438.404(c)(3).

24.     Defendant Zucker has delegated to the New York State Office of Temporary and Disability Assistance ("OTDA") the function of conducting Fair Hearings, which includes scheduling and holding Fair Hearings, and issuing recommended Decisions After Fair Hearing ("DAFHs").

25.     A designee of Defendant Zucker signs and issues all DAFHs.

26.     Medicaid recipients who request Fair Hearings have a right to receive, at a reasonable time before the hearing, copies of all documents and records used as a basis for the decision.  42 C.F.R. § 431.242(a)(2).  These documents are sent in what is referred to in New York as the "Evidence Packet."

27.     Federal law requires participating states to administer the Medicaid program through a "single state agency."  42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10(b)(1).  While the single state agency may delegate certain functions, it is prohibited from delegating "the authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters."  42 C.F.R. § 431.10(c), (e).

28.     The single state agency responsible for the administration of the Medicaid program in New York is the New York State Department of Health, of which Defendant Zucker is the Commissioner.  N.Y. Soc. Serv. L. § 363-a(1); 1996 N.Y. Laws Ch. 474, §§ 233–248.

29.     Additionally, participating States must administer the Medicaid program according to a plan that has been federally approved.  42 C.F.R. § 431.11.

30.     With the approval of the Centers for Medicare and Medicaid Services of the United States Department of Health & Human Services ("CMS"), New York operates its Medicaid program using a "Partnership Plan" that, in relevant part, requires most Medicaid recipients to enroll in a managed care organization ("MCO") with which DOH has contracted.

31.     MCOs are privately-owned and operated health insurance entities which contract with State Medicaid programs to provide Medicaid recipients with a package of covered services in exchange for payment by the State of a fixed payment per enrollee.  42 U.S.C. § 1396b(m); 42 C.F.R. §§ 438.2, 438.6; N.Y. Pub. Health L. § 4403-f.

32.     By definition, a MCO must make medical services available to its enrollees to the same extent as services are made available to other Medicaid recipients in the same area who are not enrolled in the plan.  42 U.S.C. § 1396b(m)(1)(a)(i).

33.     In approving the Partnership Plan, CMS expressly provided that, with the exception of three enumerated provisions of the Medicaid Act not relevant here, "[a]ll requirements of the Medicaid program expressed in law, regulation, and policy statement" continue to apply to New York's Medicaid program.  *See* Centers for Medicare & Medicaid Services, Partnership Plan Section 1115 Demonstration, Waiver No. 11-W-00114/2, Waiver Authority at 1 (as of April 14, 2014) ("Waiver Authority"); https://www.health.ny.gov/health_care/medicaid/redesign/docs/2015-10-01_1115_waiver_stcs.pdf.

34.     Pursuant to the Partnership Plan, in New York, Medicaid recipients who (a) receive Medicare in addition to Medicaid; (b) are eligible for "community based long term care" and (c) are expected to need at least 120 days of such care, must enroll in MLTC plans with which New York has contracted for provision of either home care services or nursing home placement.  *See* Waiver Authority at 9 (Special Terms and Conditions).

35.     As of 2013, DOH policy defines "community based long term care" as including both Instrumental Activities of Daily Living (e.g. housekeeping tasks) *and* Activities of Daily Living (e.g. bathing, grooming, toileting etc).  DOH, Office of Health Insurance Programs, MLTC Policy 13.15, https://www.health.ny.gov/health_care/medicaid/redesign/docs/policy_13_15_refining_definitio n.pdf ("MLTC Policy 13.15").

36.     All MLTC plans are MCOs.

8

37.     There are two different kinds of MLTC plans: those that are partially capitated, such as Senior Health Partners, and those that are fully capitated, such as Healthfirst CompleteCare.

38.     Partial capitation means that Defendant Zucker contracts with the MLTC to provide certain Medicaid-funded services, including home care services, and in exchange Defendant Zucker pays the MLTC a fixed amount per enrollee without regard to the number of hours of home care the MLTC provides.  *See* N.Y. Pub. Health L. § 4403-f.  Enrollees in a partial capitation plan receive their other Medicaid-funded medical services, such as basic outpatient care, on a fee-for-service basis.

39.     Full capitation means that Defendant Zucker contracts with the MLTC to provide all Medicaid-funded and Medicare-funded services, including home care services, and in exchange Defendant Zucker pays the MLTC a fixed amount per enrollee without regard to the number of hours of home care the MLTC provides. Enrollees in a full capitation plan receive all of their medical services through their MLTC plan.

40.     Whether a plan is fully or partially capitated, it provides the same Medicaid-funded home care services and is subject to the same federal and state requirements regarding timely and adequate notice and standards for reduction of care.

41.     Federal regulations require New York to include certain provisions in all contracts with MLTCs to provide Medicaid-funded services, including the requirement that MLTCs comply with all applicable laws.  42 C.F.R. §§ 438.202, 438.210(a).

42.     The contracts must further ensure "that the services are sufficient in amount, duration, or scope to reasonably be expected to achieve the purpose for which the services are furnished."  42 C.F.R. § 438.210(a)(3)(i).

9

43.     Additionally, State contracts with MLTCs must "specify what constitutes 'medically necessary services' in a manner that . . . [i]s no more restrictive than that used in the State Medicaid program as indicated in State statutes and regulations, the State Plan, and other State policy and procedures." 42 C.F.R. § 438.210(a)(4)(i).

44.     Pursuant to their contracts with the State, MLTCs provide care and services to adult recipients of Medicaid and Medicare who need more than 120 days of long term care services and meet certain other eligibility requirements. *See* MLTC Partial Capitation Model Contract at 16, https://www.health.ny.gov/health_care/medicaid/redesign/docs/mrt90_partial_capitation_model.pdf; *see also* MAP Model Contract at 33, https://www.health.ny.gov/health_care/managed_care/mltc/pdf/map_model_contract.pdf.

45.     The services that MLTCs provide pursuant to these contracts include long-term care services that enable Medicaid recipients to live safely in their homes that are collectively referred to herein as "home care services."

46.     Home care services include, at a minimum, the personal care services essential to the maintenance of the patient's health and safety in his or her home, which can include preparing meals, assistance with personal hygiene, toileting, walking, and/or other identified tasks. 42 U.S.C. § 1396d(a)(24); 42 C.F.R. § 440.167; N.Y. Soc. Serv. L. § 365-a(2)(e); N.Y. Comp. Codes R. & Regs. tit. 18 § 505.14(a)(1), (a)(5), (a)(6)(ii)(a); *see* Centers for Medicare and Medicaid Servs., STATE MEDICAID MANUAL § 4480(C), at 4-495 (1999) (describing Medicaid coverage of personal care services).

47.     Home care services also include full or part time nursing, home health aide services, medical supplies, and home-based physical therapy. 42 U.S.C. § 1396d(a)(7); 42

C.F.R. § 440.70; N.Y. Soc. Serv. L. § 365-a(2)(d); N.Y. Comp. Codes R. & Regs. tit. 18 § 505.23; N.Y. Comp. Codes R. & Regs. tit. 10 § 763.5.

48.     State law requires that the assessment "shall include, but not be limited to, an evaluation of the medical, social and environmental needs of each prospective enrollee in such program. This assessment shall also serve as the basis for the development and provision of an appropriate plan of care for the prospective enrollee."  N.Y. Pub. Health L. § 4403-f(7)(g)(i).

49.     Defendant Zucker requires MLTCs to arrange for assessments and reassessments.  *See* DOH, Office of Health Insurance Programs, MLTC Policy 13.09 (April 26, 2013), *available at*

https://www.health.ny.gov/health_care/medicaid/redesign/docs/policy_13_09_transition_of_saam_to_uas.pdf.

50.     Defendant Zucker directs MLTCs to use a Uniform Assessment tool designed by the State, and to conduct assessments in the manner specified by Defendant Zucker.  *See id; see also* DOH, Office of Health Insurance Programs, MLTC Policy 13.09(a) (September 24, 2013), https://www.health.ny.gov/health_care/medicaid/redesign/docs/policy_13a_09_transition_of_saam_to_uas.pdf.

51.     State law establishes two levels of care for Medicaid recipients' home care services.  N.Y. Soc. Serv. Law § 365-a(2)(e)(iv),  N.Y. Comp. Codes R. & Regs. tit. 18 § 505.14.  Medicaid recipients who need only "nutritional and environmental support" services, such as making and changing beds and washing dishes, receive "Level I" services.  N.Y. Comp. Codes R. & Regs. tit. 18 § 505.14(a)(i); *see* N.Y. Soc. Serv. Law § 365-a(2)(e)(iv).

52.     State law provides that recipients who receive only Level I services may not receive more than eight hours per week of home care.  N.Y. Soc. Serv. Law § 365-a(2)(e)(iv), N.Y. Comp. Code R. & Regs. tit. 18 § 505.14.

53.     "Level II" services include both the nutritional and environmental support services available in Level I and "personal care functions," such as toileting, walking, feeding, and other specified care services.  N.Y. Comp. Code R. & Regs. tit. 18 § 505.14(a)(ii).

54.     In order to be eligible for MLTC, enrollees must need both Level I and Level II services and therefore the eight-hour limit on Level I home care services is never applicable to MLTC enrollees.  DOH, Office of Health Insurance Programs, MLTC Policy 13.15.

55.     Defendant Zucker retains the responsibility for ensuring that the rights of Medicaid recipients enrolled in MLTCs are protected.  42 C.F.R. § 438.100(a), (d).

56.     To that end, federal law requires Defendant Zucker to supervise the activities of MLTCs that provide Medicaid-funded services to New Yorkers, including by auditing MLTCs' records and patient files.  *See e.g.*, 42 C.F.R. §§ 438.204(b), 438.416, 438.228(b).

57.     Federal law further requires Defendant Zucker to establish intermediate sanctions that he may use against MCOs if Defendant Zucker determines that an MCO "[f]ails substantially to provide medically necessary services that the MCO is required to provide, under law or under its contract with the State, to an enrollee covered under the contract . . . ."  42 C.F.R. § 438.700(a), (b).

58.     MLTC enrollees have the right to an internal appeal in addition to the right to a Fair Hearing.  The internal appeal is conducted by the MLTC itself.

59.     Medicaid recipients enrolled in a partial-capitation MLTC, such as Senior Health Partners, have the option of requesting an internal appeal as well as, and simultaneous to,

requesting a fair hearing.  These recipients can receive aid-continuing only if they request a fair hearing.

60.     Medicaid recipients enrolled in a Medicare Advantage Plan ("MAP"), such as Healthfirst Complete Care, *must* request an internal appeal as a precondition to requesting a Fair Hearing.  These recipients are entitled to aid-continuing during the pendency of their internal appeal.  If their internal appeal is not decided fully favorably to them, they may request a fair hearing and are entitled to aid-continuing during the fair hearing process as well.

61.     Medicaid recipients enrolled in a MAP plan are entitled to a ten day advance notice of an initial adverse action and another ten day advance notice if their internal appeals are not fully favorable.

62.     Defendant Zucker's contracts with Healthfirst Defendants require them to send timely and adequate notices of termination and reduction in home care services.

63.     On July 1, 2015, Defendant Zucker issued a formal policy statement requiring partial-capitation MLTCs that intend to reduce or terminate home care services to notify the Medicaid recipient of that proposed action using a form notice drafted by the Department of Health.

64.     Upon information and belief, Defendant Zucker excuses partial-capitation MLTCs from this requirement at their request.

## CLASS ACTION ALLEGATIONS

65.     Named Plaintiffs Olga Caballero, Jie Du, by her next friend Michael Tong, Alejandra Negron, Mariano Vazquez, by his next friend Iraida Vasquez, and Juan Santos, by his next friend Rita Baez bring this action, pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of themselves and as representatives of a class of:

13

All current and future Medicaid recipients who receive home care services through Healthfirst Defendants' MLTCs and who have suffered since January 1, 2015, or who will suffer threatened or actual reductions of their home care services without timely and adequate notice, and / or based on arbitrary limits on care.

66.     The class is so numerous that joinder of all class members in this action would be impracticable.  Over 10,000 individuals receive Medicaid-funded home care services through Healthfirst Defendants' MLTC plans.

67.     It would be impracticable for potential plaintiffs, who are, by definition, disabled and indigent individuals, to obtain legal services on an individual basis for their claims.  Hence, their rights under the law may well be meaningless without certification of a class action seeking common redress.

68.     There are questions of law and fact common to the class about the systemic customs and practices described below at ¶¶ 79-84, 87-90, 93-104, 105-124, including:

a.   whether Healthfirst Defendants have a systemic custom and practice of threatening to reduce or reducing their enrollees' home care services, without sending timely and adequate notices about the reductions, and without legitimate bases for the reductions;

b.   whether Healthfirst Defendants have a systemic custom and practice of misleading enrollees about the possibility of successfully challenging proposed reductions by describing those reductions inaccurately, including by describing them as based on New York State law and regulations;

c.   whether Defendant Zucker is aware of Healthfirst Defendants' customs and practices and continues to allow and facilitate these customs and practices; and

d.  whether, in engaging in the actions and practices described below, Healthfirst Defendants and Defendant Zucker violate 42 U.S.C.§ 1396a(a)(3); 42 C.F.R. §§ 431.211, 438.10; 438.210, 438.400-410; N. Y. Soc. Servs. Law § 22(12); N.Y. Comp. Code R. & Regs. tit. 18 §§ 505.14(b)(5)(v)(c); 358-2-2, 358-2.23, and 358-3.3; and the Due Process Clauses of the 14th Amendment to the United States Constitution, U.S. CONST. AMEND. XIV, § 1; and of the New York State Constitution, N.Y. Const. Art. I, § 6.

69.  The Named Plaintiffs' claims are typical of the claims of the class in that they did not receive timely and adequate notice of the proposed reductions of their home care services; the notices they did receive are misleading in the way they attempt to justify the reductions and allege no changes in condition that would justify the reductions; and they have not had changes in their conditions or circumstances that would justify the threatened reductions.

70.  The Named Plaintiffs will adequately represent the interests of the class.  They are members of the proposed class and there are no conflicts of interest between them and other proposed class members in that all proposed class members would benefit by obtaining timely and adequate notice of home care reductions or terminations, and by no longer being subject to misleading and baseless threats to reduce care or to actual wrongful reductions.

71.  Plaintiffs are represented by the New York Legal Assistance Group ("NYLAG") and Paul, Weiss, Rifkind, Wharton & Garrison, LLP, as *pro bono* co-counsel.

72.   NYLAG is a public interest law firm with extensive experience in litigating class action cases, including numerous cases involving public benefits, including Medicaid funded home care services.  For example, NYLAG was class counsel in *Shakhnes v. Eggleston*,

740 F. Supp. 2d 602 (S.D.N.Y. 2010) (certifying Rule 23(b)(2) class of Medicaid home health care recipients), *aff'd sub nom. Shakhnes v. Berlin*, 689 F.3d 244 (2d Cir. 2012) .

73.     Paul, Weiss is a firm of more than 900 lawyers.  It represents large publicly and privately held corporations and investors, as well as clients in need of pro bono assistance, in a wide variety of matters.

74.     A class action is the appropriate method for a fair and efficient adjudication of this matter in that Defendants have acted or refused to act in a manner generally applicable to the class as a whole and a class action will avoid numerous separate actions by class members that would unduly burden the courts and create the possibility of inconsistent decisions, thereby making final injunctive and declaratory relief appropriate as to the class as a whole.

## FACTS CONCERNING THE CLASS

75.     Members of the proposed class depend on Medicaid-funded home care services provided through the Healthfirst Defendants and given by an aide or nurse, in order to remain safely in their own homes.  In many cases these individuals would have to permanently reside in a Medicaid-funded nursing home or other institution if not for their home care services.

76.     Members of the class, all of whom need home care services in order to live safely in the community, are very vulnerable.  By definition, they cannot manage alone. They have multiple chronic conditions, many of which are degenerative - and do not improve - such as dementia and osteoarthritis, and require home care services for basic activities of daily living including ambulation, toileting, and cooking.

**A.**      **Healthfirst Defendants' Practices Regarding Authorization of Home Care Services**

77.      Pursuant to his obligations under the Medicaid Act and its implementing regulations, Defendant Zucker's contracts with Healthfirst Defendants require Healthfirst Defendants to comply with the Medicaid Act and its implementing regulations and state law and regulations in their processes to assess, authorize, provide, deny, reassess, reauthorize, increase, reduce, terminate and discontinue Medicaid-funded home care services for all Medicaid recipients receiving home care services through Healthfirst Defendants.  *See* MLTC Partial-Capitation Contract Art. II; MAP Model Contract § 14.3(h).

78.      Healthfirst Defendants make decisions about enrollees' needs for care through an assessment process in which a registered nurse goes to the home of an enrollee to examine the enrollee and ask questions.

79.      As part of the assessment, the nurse generally completes at least three specific documents which are subsequently reviewed by an associate medical director who renders a decision about the amount of care to authorize.

80.      Those three documents are a Uniform Assessment System (UAS), a Supplemental Nursing Assessment, and an Aide Task Service Plan (ATSP).

81.      The UAS is a form created by Defendant Zucker, to be completed by an assessing nurse, that is intended to represent a comprehensive assessment of an individual's medical condition and need for assistance.

82.      The Supplemental Nursing Plan is a Healthfirst form, and is intended to supplement the UAS.  In many respects, it is duplicative of the UAS; but it also captures information regarding an enrollee's social circumstances, such as the enrollee's informal caregivers, and other information, such as information about the enrollee's home.

83.     The ATSP is a Healthfirst form.  It is broken down by task, by day, and by minute, so that the assessing nurse can hypothetically determine how much time it will take to perform each task, each day, and each week.

84.     A Healthfirst Associate Medical Director signs every notice of proposed reduction, purportedly after reviewing all of the assessment documents and making the final determination about the amount of home care services to authorize.

85.     The assessment documents are not sent with the notice of proposed reduction.

86.     An enrollee cannot see these documents unless she requests a fair hearing and then requests the evidence packet.

87.     On its face, the ATSP contains limits on the amount of care that can be authorized for various tasks.  There are a maximum number of times a particular task can be performed per day and a maximum amount of time that can be allotted for each time it is performed.

88.     There are directions for completion of the ATSP.  These directions permit the nurse to increase the maximum number of times per day that a task can be performed under certain circumstances to a higher, but specific maximum.  For example, the normal maximum number of times per day an aide can assist an enrollee with toileting is 3, but the instructions indicate that, if the person is incontinent, the nurse may increase the maximum to 6.

89.     While there are circumstances in which the nurse can increase the daily frequency of tasks, there are no circumstances in which the nurse can increase the maximum amount of time it may take to perform each task, even though the time it takes to perform many tasks such as assisting the enrollee in dressing, bathing, and walking, will depend on the abilities of the enrollee.

90.     The ATSP has no mechanisms for accounting for the span of time between tasks. For example, if an enrollee is provided the maximum time for daily toileting, 60 minutes, those 60 minutes are lumped together with all the other tasks that the person needs into a single block of time.  It does not account for the fact that the individual's need for assistance with toileting will inevitably come up at unpredictable times over the course of the entire day and night.

**B.      Healthfirst Defendants' Practices Regarding Reductions of Home Care Services**

91.     Defendant Zucker pays the Healthfirst Defendants a set monthly rate per each individual Medicaid recipient enrolled in their programs.  This rate does not change depending on the amount of care the recipient needs or is given.

92.     This capitated rate creates a perverse incentive for Healthfirst Defendants:  the less care they provide to each individual, the more they earn.

93.     Healthfirst Defendants have a practice of threatening to reduce or reducing the number of hours of home care services provided to recipients based on, among other things, arbitrarily restricting the duration of time that can be authorized to perform each task, as well as the number of times the task may be performed each day or each week.

94.     Healthfirst Defendants have a custom and practice of threatening to reduce or reducing hours of home care because they will not authorize "span of time" care that allows aides to be present to assist people with tasks, like toileting, that cannot be scheduled. Healthfirst Defendants allocate a total number of minutes for assistance with toileting as part of the total number of hours of home care services it will provide.  An individual who needs assistance with toileting, however, needs such assistance throughout a twenty-four hour period rather than for any given number of minutes in a single block of time.

95.     Healthfirst Defendants have a custom and practice of reducing the amount of time they authorize for aides to perform specific tasks to amounts that are wholly inadequate. For example, SHP has authorized just two hours per week for an aide to prepare, cook, and clean up all 21 of Ms. Negron's meals, which works out to less than six minutes per meal.

96.     Healthfirst Defendants have a custom and practice of improperly limiting the amount of all "Level I" services they provide to their members to 8 hours per week, including meal preparation, all housecleaning and other housework, all grocery and other errands and shopping such as pharmacy shopping, and escorting to medical appointments.

97.     Healthfirst Defendants have a custom and practice of reducing the home care services of Medicaid recipients whose medical condition is the same or worse than it was in the previous authorization and whose social circumstances have not changed.

## C.     Healthfirst Defendants' Practices Regarding Notices of Reduction

98.     Healthfirst Defendants have a custom and practice of threatening to reduce and reducing the amount of care provided to recipients without providing timely and adequate notice as required by federal and state law.

99.     Healthfirst Defendants have a custom and practice of failing to send notice in time to allow recipients ten days to request a Fair Hearing and aid-continuing before the threatened reduction will take place.

100.     Healthfirst Defendants have a custom and practice of sending notices that threaten to reduce or that actually reduce care on the grounds that the prior, higher, amount of care was mistakenly authorized even though no mistake was ever made.

101.    Healthfirst Defendants have a custom and practice of sending notices that mislead recipients about their ability to successfully challenge proposed reductions by inaccurately describing the reductions as being required by rules and regulations.

102.    For example, when Healthfirst Defendants send notices that threaten to reduce care on the grounds that the prior amount of care was based on a mistake, Healthfirst Defendants cite New York State regulations in support of their allegation of mistake, even though the cited regulations do not support the allegation.

103.    Healthfirst Defendants have a custom and practice of sending notices to members of the class that state that they are reducing hours for particular tasks, such as meal preparation, because the hours spent on such tasks "should be considered part of the housekeeping support."

104.    This statement in the notices is always false and misleading because whether meal preparation should be considered part of the housekeeping support is not relevant to any legitimate calculation of how long meal preparation takes.

**D.      Defendant Zucker's Practices and Knowledge of Healthfirst Defendants' Practices**

105.    Defendant Zucker knows that Healthfirst Defendants are engaging in the practices described above.

106.    For example, Defendant Zucker has issued Decisions After Fair Hearing in hundreds of cases disapproving proposed reductions in care by Healthfirst Defendants, thus establishing that he is aware that Healthfirst Defendants attempt to reduce home care services without sending timely or adequate notices and without legitimate bases for the reductions.

107.    Defendant Zucker obtains information about problems with Medicaid-funded home care services provided by Healthfirst Defendants through enrollee-facing methods including complaint hotlines run by Defendant Zucker and an independent ombudsman program funded by Defendant Zucker.

108.    Defendant Zucker knows or should know that Healthfirst Defendants arbitrarily limit home care services to recipients.

109.    Upon information and belief, Defendant Zucker has received a large number of complaints about Healthfirst Defendants' improper threats to reduce care and actual reductions of care, including reductions with improper notices, through his complaint hotlines and the independent ombudsman program.

110.    According to publicly-available information published by Defendant Zucker, for the period July 2015 through September 2015, 17,345 people were enrolled in the Healthfirst defendants' MLTC plans. This number represents 12.3 percent of all MLTC enrollees. Department of Health, Partnership Plan Section 1115 Quarterly Report and Annual Report, Demonstration Year: 17 (10/1/2014 – 9/30/2015), Federal Fiscal Quarter: 4 (7/01/2015 – 9/30/2015). https://www.health.ny.gov/health_care/medicaid/redesign/docs/partnership_plan_2015_annual_rpt.pdf (hereafter the "Partnership Plan Report").

111.    During the same period, according to Defendant Zucker's report, 552 enrollees in the Healthfirst defendants' MLTC plans filed internal appeals challenging decisions made by their MLTC. *Id.*  This represents 34.6 percent of all appeals filed by MLTC enrollees in the State of New York.

112.    OTDA maintains an online database, in which it makes publicly available a redacted version of every DAFH signed by Defendant Zucker.

113.    That database shows that, for the period September 2015 through February 2016, there were 1387 DAFHs issued involving reductions proposed by an MLTC.

114.    Of those 1387 DAFHs issued during that six-month period, 777 — 56 percent — involved reductions proposed by Healthfirst Defendants.

115.    No other MLTC's proposed reductions were challenged as frequently as Healthfirst Defendants': for all 31 other MLTCs, combined, there were 610 DAFHs concerning proposed reductions.

116.    Of the 777 DAFHs challenging a reduction in home care services proposed by Healthfirst Defendants, only four upheld the proposed reduction.

117.    Out of the 777 DAFHs challenging a reduction in home care services proposed by Healthfirst Defendants, Healthfirst Defendants withdrew their notice of reduction, leaving the recipient's hours of home care services unchanged, in 564 cases.

118.    Out of the 777 DAFHs challenging a reduction in home care services proposed by Healthfirst Defendants, 106 memorialize an agreement between the Medicaid recipient who was appealing a proposed reduction and the Healthfirst Defendants in which the Medicaid recipient agreed to accept a number of hours of home care services less than their original amount but greater than the proposed reduction in the notice.

119.    Healthfirst Defendants have a practice of misstating the law to pressure Medicaid recipients who are appealing a proposed reduction of their home care hours into a settlement.

120.    In at least one DAFH, a supervising Administrative Law Judge rejected a settlement between a Medicaid recipient and her Healthfirst MLTC plan.  The plan had

proposed to reduce her home care services from 20 to 6 hours per week, on the basis of prior

mistake – namely, that the previous authorization was not legally permitted – and then offered

to settle for 18 hours.  In rejecting the proposed settlement, the supervising ALJ explained:

> the hearing transcript tends to suggest that [the recipient] may well have accepted the
> offered deal based upon the belief that the Plan's counsel was correct in stating that the
> Plan was not legally permitted to allot time to "additional findings" … which offends the
> notions of due process underlying the Fair Hearing process.  Since Counsel's legal
> contention was incorrect, and was not in way [*sic*] questioned or even discussed by the
> Administrative Law Judge, and, furthermore, because the Plan made use of an
> inadequate Notice and did not appear with evidence sufficient to establish that its
> determination was correct, the present decision is being issued[.]

FH # 7074557N at 10-11.

121.    Defendant Zucker has failed to take effective action to compel Healthfirst

Defendants to comply with their obligations under their contracts and pursuant to the relevant

federal and state statues, regulations, and due process requirements.

122.    Defendant Zucker has failed to take effective action to protect class members'

rights under the Medicaid Act, relevant state laws, and the Due Process clauses of the United

States and New York Constitutions.

123.    Defendant Zucker has a custom and practice of failing to ensure that Healthfirst

Defendants send timely and adequate notices when threatening to reduce or reducing home care

services.

124.    Defendant Zucker has a custom and practice of failing to ensure that Healthfirst

Defendants threaten to reduce or reduce home care services only if they have adequate

justification.

**E.**      **Harms Suffered by the Class**

125.      Medicaid recipients who are subject to arbitrary reductions in their care experience significant harm.

126.      Many class members fall or are at risk of falling without adequate assistance for ambulating and transferring.  Other class members develop bed sores from lack of appropriate turning and positioning.  Lack of assistance often leads to an inadequate and irregular diet that may exacerbate pre-existing medical conditions such as diabetes or hypertension.  Loss of basic housekeeping tasks, such as cleaning, place class members in unhygienic environments.  Lack of assistance with toileting leaves class members in unsanitary and unhygienic environments.

127.      Receipt of inadequate and confusing notices, especially those wrongfully describing reductions as required by law and regulations, itself harms vulnerable recipients of home care services, who suffer acute anxiety about the threatened loss of necessary services.

128.      Many members of the class are unaware that they have a right to a home hearing. And even for those class members who are able to request a Fair Hearing and get aid-continuing, attending a Fair Hearing in the Hearing Office is itself a harm.  All class members are disabled and the Fair Hearing process is usually physically uncomfortable and anxiety provoking, and often painful and terrifying.  It always requires waiting in lines and passing through two security checkpoints with metal detectors.  Because OTDA schedules numerous hearings for each time slot, it is common for recipients to wait for more than two or three hours for their Fair Hearings to be called.  Eating, drinking, and using a telephone are all prohibited. There are often lines to use the restrooms, which are rarely clean.

## FACTS CONCERNING NAMED PLAINTIFFS

**OLGA CABALLERO**

129.    Olga Caballero is a 67 year-old woman who lives alone in Brooklyn and receives Medicaid and Medicare.

130.    Ms. Caballero speaks only Spanish. She does not read or write in Spanish or English.

131.    She suffers from numerous medical conditions, including diabetes mellitus, lower back pain, osteoarthritis, asthma, high blood pressure, chronic obstructive pulmonary disease, depression, and dementia.

132.    Because of her medical conditions, Ms. Caballero needs assistance with many of her daily activities, including bathing and getting dressed, cooking, shopping, laundry, cleaning, moving about, toileting and incontinence care.

133.    Ms. Caballero uses a cane and needs the help of her home attendant to help her move around inside her home.  Her gait is so unsteady that, when she is alone in her apartment, she moves as little as possible for fear of falling.

134.    There is no elevator in Ms. Caballero's building and she cannot navigate the stairs on her own, so she can never leave home without help.

135.    Until October 1, 2015, Ms. Caballero received 35 hours per week of home care services through Senior Health Partners; since then, she has received home care services through Healthfirst CompleteCare.

136.    Ms. Caballero's 35 hours of home care services are provided from 8 am to 3 pm, Monday through Friday, which is insufficient to meet her needs.  On the weekends, and every afternoon, she is unable to leave her apartment and tries to stay in bed for fear of falling.

137.    Ms. Caballero's family members visit her from time to time, but are unable to do so on a regular basis.  Ms. Caballero struggles to keep herself safe and to accomplish necessary daily activities with her authorized 35 hours of home care.

138.    On or about November 2, 2015, Ms. Caballero received a notice stating that Healthfirst CompleteCare would reduce her home care services by over 77 percent to a mere eight hours per week effective November 17, 2015, based on an assessment done October 6, 2015.

139.    The notice is signed by Patricia Bronzert, an Associate Medical Director at Healthfirst.

140.    As she is illiterate, Ms. Caballero was unable to read the notice, and had to wait for her social worker to find out what it said.

141.    The November 2, 2015, notice states that the reason for the drastic reduction in care is that the "requested service" (the amount of care she was actually receiving) is no longer medically necessary. It states:

> We are changing the services you receive to correct a mistake we found in the previous personal care services authorization.  You were receiving 10 hours per week of additional services that were not linked to a specific personal care task which were removed.  In accordance with NY State regulations and guidelines for Personal Care Assistance, services are intended to provide assistance with specific environmental and nutritional functions as well as activities of daily living.  See 18 NYCRR 505.14 (a) (6) and the NYS Personal Care Guidelines released on May 31, 2013.  Also, some of your prior hours were based on an overestimation of the time needed for your activities of daily living.  You were receiving three (3) hours per week independently for simple meal preparation which is normally included in housekeeping hours.  You were also receiving five (5) hours per week for help with incontinence care which you can manage independently.  You were also receiving seven (7) hours per week for help with toileting, transferring, walking, and dressing your upper body, all of which you require supervision only.  Therefore, your current assessment is based on your current condition and provides a more accurate amount of time while ensuring your personal care needs are met.

142.    Although the sum of the reductions specified in the notice is 25 hours, the notice threatened a reduction of 27 hours.

143.    The notice gives the false impression that the reduction is required by New York State regulations.

144.    The notice fails to give Ms. Caballero the information needed to provide her with a meaningful basis on which to decide whether to ask for a Fair Hearing or the information needed to defend against the proposed reduction at a Fair Hearing.

145.    The notice contains numerous infirmities, including, but not limited to, false factual allegations, misleading references to regulations, and illegitimate substantive reasons for the reduction.

146.    The grounds for reduction alleged in the notice are all either false or legally invalid.

147.    The grounds for the reduction alleged in the notice are based not on any changes in Ms. Caballero's actual condition or needs, but rather on changes in the way that Healthfirst Defendants characterized her needs in their assessments and ATSPs. The notice does not provide the information about those changes that is necessary to make a meaningful decision about whether to seek a fair hearing.

148.    The assessments and ATSPs in the Evidence Packet Ms. Caballero's attorneys obtained show that the proposed reduction was based on arbitrary limits and not on Ms. Caballero's actual needs and that statements in the notice were false.

149.    For example, the statement in the notice that Ms. Caballero had been receiving ten hours not linked to a specific task is false, because, in a prior assessment, in October 2014, Ms. Caballero was found to need ten hours per week for assistance with ambulation and

transferring because of her unsteady gait.  Her need for those ten hours was documented in a section of the assessment titled "Additional Findings" and attributed to her unsteady gait and need for assistance with ambulation and transferring.

150.    Similarly, the notice's assertions that (a) Ms. Caballero's number of home care services was based on an "overestimation of the time needed" and (b) the most recent assessment "provides a more accurate amount of time" are both false and misleading.

151.    Ms. Caballero was assessed in October 2014, March 2015, and October 2015.

152.    The assessment performed in October 2015, found "no change" from previous assessments in Ms. Caballero's need for assistance with activities of daily living or in her level of self-sufficiency.

153.    Despite the finding that Ms. Caballero's conditions and needs had not changed, each of the three ATSPs provided radically different amounts of time for tasks, both those performed by aides alone and those performed by aides directly assisting Ms. Caballero.

154.    For example, in 2014, the assessment allocated 100 minutes per week to dinner preparation.  In March 2015, it allocated 55 minutes per week, and in October 2015, it allocated no time whatsoever to dinner preparation, even though the assessment noted that she needed "extensive assistance" with meal preparation, and there is no indication on the assessment that anyone else had offered to make her dinner.  In fact, Ms. Caballero cannot cook on her own.

155.    As another example, the Notice says Ms. Caballero needs "supervision" for toilet use.  The 2014 ATSP provided 125 minutes per week related to toileting; the March 2015 ATSP provided 50 minutes; and the October 2015 ATSP provided no time at all.  Ms. Caballero needs her aide's assistance in getting onto the toilet and getting up, dressing herself afterwards, and changing her diapers.

156.    Despite the fact that the nurse who assessed Ms. Caballero in October 2015 found her condition and need for assistance to be unchanged, she recommended that Ms. Caballero's care be reduced by over 77 percent from 35 hours per week to 8 hours per week.

157.    Because Ms. Caballero is a MAP enrollee, she was required to file an internal appeal before requesting a fair hearing.  On November 10, 2015, Ms. Caballero's daughter Magalis verbally requested an internal appeal with Healthfirst.  However, Ms. Caballero's hours were reduced shortly thereafter.

158.    Her family was not able to pay her aide privately to stay for the hours that were cut.

159.    Thus, for several weeks, Ms. Caballero was denied necessary care and left alone for extended periods of time.  She spent most of her days during those weeks in bed to avoid falling or injuring herself.

160.    Ms. Caballero suffered from depression during the weeks that her care was reduced.  She felt helpless.  She relied on a friend who was on vacation to help her prepare food and move about her home, but her friend was only able to provide minimal assistance.  Ms. Caballero was not able to clean her home or change her linens, and experienced asthma flare-ups because of dust build-up in her home.  Because she cannot read, she could not pay her bills or her rent by herself.

161.    In its decision on the internal appeal, Healthfirst partially upheld its decision to reduce Ms. Caballero's hours of home care services and approved 15 hours of care, but without an effective date.

162.   The notice with the appeal decision does not provide sufficient information about the basis for the decision to enable Ms. Caballero to make a meaningful decision about whether to seek a fair hearing.

163.   Ms. Caballero's social worker referred her to NYLAG for assistance and NYLAG requested a Fair Hearing for Ms. Caballero on or about December 9, 2015.  In mid-December, Ms. Caballero's 35 hours of home care services were restored as aid-continuing pending her hearing.

164.   Ms. Caballero's Fair Hearing was scheduled for January 6, 2016.  However, Ms. Caballero became sick with bronchitis in the first week of January and was not able to attend.

165.   Ms. Caballero's Fair Hearing was held on February 2, 2016.  At the hearing, Healthfirst defendants withdrew the notice of reduction and agreed to maintain Ms. Caballero's 35 hours of home care services for now.

166.   Because Ms. Caballero still needs home care services to remain safely at home, and because she still receives those services from Healthfirst Defendants, she is vulnerable to a repetition of the harms alleged in this Complaint.


**JIE DU**

167.   Jie Du is a 96 year-old woman who lives alone in Brooklyn and receives Medicaid.

168.   Ms. Du lives in a basement apartment.  Her daughter and son-in-law, who assist with her care, live in an apartment upstairs.

31

169.    Ms. Du suffers from numerous medical conditions including blindness, dementia, osteoarthritis, and restlessness and agitation, all of which significantly limit her ability to function on her own.

170.    Because of her medical conditions, Ms. Du cannot walk without assistance, and she needs help with virtually all of her daily activities, including bathing, getting dressed, cooking, shopping, laundry, cleaning, and using the bathroom.

171.    Because of her dementia, Ms. Du cannot be left alone.  She does not fully understand her own limitations, and recently fell and broke her wrist because she tried to walk alone in the house without her cane.

172.    Since that fall, Ms. Du's spirits have declined, and she is more and more passive and confused.

173.    Ms. Du receives home care in the amount of 42 hours per week, six hours per day, seven days a week.

174.    Ms. Du struggles to stay safe and to accomplish her necessary daily activities with her authorized 42 hours of home care.  She relies heavily on her daughter and son-in-law to care for her in the evenings and on the weekends, but their jobs and other commitments make it difficult for them to care for her during all the hours when Ms. Du does not receive home care, and any further reductions in authorized home care will make it impossible for Ms. Du's relatives to adequately care for her.

175.    In December 2015, Ms. Du received a notice from Healthfirst Defendants, dated December 15, 2015, stating that her home care services would be reduced by over 28 percent from 42 hours per week to 30 hours per week, effective December 30, 2015, based on an assessment done on November 24, 2015.

176.    The notice is signed by Patricia Bronzert, an Associate Medical Director at Healthfirst.

177.    The notice states that the reason for the reduction is that the "requested service" (the amount of care she was actually receiving) is no longer medically necessary.  The notice states:

> We are changing the services you receive to correct a mistake we found in the previous personal care services authorization.  You were receiving over 3 hours per week for additional services that were not linked to a specific personal care task and were removed.  In accordance with NY State regulations and guidelines for Personal Care Assistance, services are intended to provide assistance with specific environmental and nutritional functions as well as activities of daily living.  See 18 NYCRR 505.14(a)(6) and the NYS Personal Care Guidelines released on May 31, 2013.  You were receiving 5 hours per week for cognitive prompting.  Cognitive prompting includes such activities as asking if you remember what day it is today or asking if you remember your address.  This activity is considered to be an incidental function, and is not a specific standalone function required to be performed by a personal care assistant. See 18 NYCRR 505.14(a)(6).  Also, some of your prior hours were based on an overestimation of the time needed for your activities of daily living.  You were receiving over 4 hours per week independently for simple meal preparation which should be considered part of the Level 1 support time.

178.    The notice gives the false impression that the reduction is required by New York State regulations.

179.    The notice fails to give Ms. Du the information needed to provide her with a meaningful basis on which to decide whether to request a Fair Hearing or the information needed to defend against the proposed reduction at a Fair Hearing.

180.    The notice contains numerous infirmities, including false factual allegations, misleading references to regulations, and substantive reasons for the reduction that are not legitimate.

181.    The grounds for the reduction alleged in the notice are not based on any changes in Ms. Du's actual condition or needs, but are only based on changes in the way that Healthfirst characterized her needs in its assessments and ATSPs.

182.    Despite the severe deficiencies in the notice, Ms. Du's son-in-law contacted NYLAG and obtained help.  Ms. Du's attorneys requested and received the Evidence Packet containing the assessments and ATSPs.

183.    These documents show that the reasons for the reduction given in the notice are not supported by the assessments on which they purport to be based.

184.    The assessments and ATSPs in the Evidence Packet show arbitrary changes in the amounts of time Ms. Du is said to need care; the changes are clearly not based on changes in her condition.

185.    The assessments and ATSPs reveal that the grounds for the reduction alleged in the notice are false and misleading.

186.    For example, the notice asserts that 3 hours were incorrectly approved because they "were not linked to a specific personal care task."  It is true that the July 22, 2014 assessment provided for 3 hours per week based on an "additional finding," rather than a specific task, but the nurse noted that the reason for these additional hours was Ms. Du's blindness, a fact that significantly adds to the time it takes for her aide to help her with each task.

187.    The notice states that 5 hours would be removed because they were provided for "cognitive prompting," incorrectly characterizing that task as "asking you if you remember what day it is and if you remember your address."  In fact, cognitive prompting consists of providing a patient with the necessary verbal and physical cues to enable them to participate in their

34

activities of daily living as much as possible, and is necessary for Ms. Du because of her

blindness and dementia.

188.    Prior to the November 24, 2015 assessment Ms. Du was assessed on July 2,

2015, January 13, 2015, and July 23, 2014.

189.    In the November 24, 2015 assessment, the nurse found that Ms. Du's status had

declined and her overall self-sufficiency had deteriorated.

190.    Despite the fact that the nurse found her condition to have deteriorated and

declined, she recommended that Ms. Du's care be reduced by over 28 percent from 42 hours per

week to 30 hours.

191.    The November 24, 2015 ATSP authorizes less time for ambulation, transferring,

and toileting than either the July 22, 2014 or the January 13, 2015 ATSP, without providing any

explanation for how or why these needs could now be met with providing significantly fewer

authorized hours of care.

192.    None of the assessments takes into account the span of time during which

assistance with toileting and ambulation is needed or the fact that toileting cannot be scheduled.

193.    The November 2015 ATSP inexplicably removes all the time previously given

for dinner preparation and dinner feeding.

194.    Because of her blindness, dementia, and weakness, Ms. Du cannot prepare meals

or feed herself.

195.    Prior to threatening to this reduction in Ms. Du's care, Healthfirst Defendants did

not ask her family members whether they are willing and able to prepare dinner and feed Ms.

Du.

196.   Ms. Du's daughter and son-in-law are willing and able to take care of Ms. Du some of the time, but, because of their work schedules, they are unable to care for her enough to compensate for the 28 percent reduction in home care provided by Healthfirst.

197.   Because of Ms. Du's relatives' work schedules, they are unable to guarantee that they are available to prepare dinner and feed it to Ms. Du.

198.   There has been no change in Ms. Du's condition or circumstances that would justify a reduction of her hours of care.

199.   Despite the deficiencies in Ms. Du's November 2015 notice from Healthfirst Defendants, Ms. Du's son-in-law timely requested a Fair Hearing on December 22, 2015.

200.   Ms. Du's Fair Hearing was held on January 25, 2016.  At the hearing, Healthfirst Defendants withdrew their notice of reduction and agreed to maintain Ms. Du's 42 hours of home care services for now.

201.   Because Ms. Du still needs home care services to remain safely at home, and because she still receives those services from Healthfirst Defendants, she is vulnerable to a repetition of the harms alleged in this Complaint.


**ALEJANDRA NEGRON**

202.   Alejandra Negron is a 71 year-old woman who lives alone in Manhattan and receives Medicaid and Medicare.

203.   Ms. Negron suffers from numerous medical conditions, including severe asthma, emphysema, COPD, diabetes, osteoporosis, osteoarthritis, chronic pain, and coronary artery disease.

204.    Because of her medical conditions, Ms. Negron cannot walk without help, and needs assistance with virtually all of her daily activities, including bathing, getting dressed, cooking, shopping, laundry, cleaning, and using the bathroom.

205.    Ms. Negron's arthritis is particularly severe in her fingers and her left knee.  Her fingers appear curled and twisted, and she is unable to perform simple tasks like opening a jar or holding a pot.  This debilitating condition means that she cannot prepare even simple meals, and without the assistance of an aide or family member, she is able to eat only a piece of bread.

206.    Ms. Negron is also unable to bend her left knee due to her arthritis, which causes significant balance problems when she attempts to stand or walk.  When she fell in her apartment in 2014, it took over an hour for her daughter and the doorman in her building to get her back on her feet.  Ms. Negron is afraid of falling again and therefore tries not to get up when she is alone in the apartment.

207.    Ms. Negron takes a number of medications for her diabetes, including a diuretic that results in her having to use the bathroom one to three times per hour.  She requires assistance with changing her pull-ups and pulling up her pants because she cannot bend forward sufficiently to complete these tasks and because she has limited mobility in her left arm.  She also has a collapsible trachea and is in danger of breathing problems if she bends forward to attempt these tasks on her own.

208.    Ms. Negron's diabetes medication must be taken on a strict schedule and must always be taken with food.  As a result, she must eat regular meals and snacks throughout the day.

209.    Ms. Negron has a hard mass on her left shoulder that impedes movement of her arm.  As a result, she cannot lift her arm to complete tasks such as opening a cupboard or washing her hair.

210.    Prior to January 2015, Ms. Negron received 55 hours per week of home care services.

211.    In January 2015, Ms. Negron learned that Healthfirst Defendants had decided to reduce her home care services to fifty hours per week.  She was verbally told it was because SHP did not want to pay the aide overtime.  Ms. Negron did not receive written notice about the reduction and did not know of her right to a fair hearing. She thus was unable to challenge the reduction and her hours were reduced.

212.    Between January 2015, and November 2015, Ms. Negron continued to receive fifty hours per week of home care, eight hours per day, Monday through Friday and five hours each on Saturday and Sunday.

213.    Ms. Negron's daughters and granddaughter provide her with additional care in the evenings and weekends, but they are unable to care for her during the day because of their work schedules.

214.    Ms. Negron struggles to accomplish all of her daily activities with her authorized 50 hours of home care.  She relies heavily on her daughters and granddaughter to care for her in the evenings and on the weekends, and when they are unable to arrive before her aide's shift ends, Ms. Negron remains in her bed until her family arrives.

215.    On or about November 29, 2015, Ms. Negron received a notice from Healthfirst Defendants.

216.    The notice was dated November 18, 2015, but arrived in an envelope postmarked November 21, 2015.

217.    The notice stated that Ms. Negron's home care services would be cut in half from 50 hours per week to 25 hours per week, effective December 3, 2015, based on an assessment conducted on October 15, 2015.

218.    The notice is signed by Patricia Bronzert, an Associate Medical Director at Healthfirst.

219.    The notice states that the reason for the 50 percent reduction is that the "requested service" (actually the amount of care she was already receiving) is no longer medically necessary, and that the change is to correct a mistake in the previous personal care services authorization.  The notice states:

> We are changing the services you receive to correct a mistake we found in the previous personal care services authorization.  The 14 hours per week of additional services that you were receiving, which were not linked to a specific personal care task, were removed.  In accordance with NY State regulations and guidelines for Personal Care Assistance, services are intended to provide assistance with specific environmental and nutritional functions as well as activities of daily living.  See 18 NYCRR 505.14(a)(6) and the NYS Personal Care Guidelines released on May 31, 2013.  Also, some of your prior hours were based on an overestimation of the time needed for your activities of daily living.  You were receiving over 7 hours per week independently for simple meal preparation, which should be considered part of the housekeeping support.  Your current assessment is based on your current condition and provides a more accurate amount of time while ensuring your personal care needs are met.  After review of all the information, including the most current assessment, as outlined below, Healthfirst is changing the service you currently receiving (sic).  We are approving a total of 25 hours per week for personal are (sic) assistance support.

220.    Although the sum of the identified reductions in the notice is 21 hours, the notice threatened a reduction of 25 hours.

221.    The notice gives the false impression that the reduction is required by New York State regulations.

222.     The notice fails to give Ms. Negron the information needed to provide her with a meaningful basis on which to decide whether to ask for a Fair Hearing or with the information needed to adequately defend against the proposed reduction at a Fair Hearing.

223.     The notice contains numerous infirmities, including false factual allegations, misleading references to regulations, and substantive reasons for the reduction which are not legitimate.

224.     The grounds for the reduction alleged in the notice are not based on changes in Ms. Negron's actual condition or needs, but only on the way that Healthfirst Defendants characterized her needs in their assessments and ATSPs.

225.     The assessments and ATSPs in the Evidence Packet obtained by Ms. Negron's attorneys show that the proposed reduction was based on arbitrary limits and not on Ms. Negron's actual needs and that statements in the notice were false.

226.     The grounds for reduction alleged in the notice are all either false or legally invalid.

227.     For example, the statement in the notice that Ms. Negron had been receiving 14 hours not linked to a specific task is false, because, in a prior assessment, in March 2015, Ms. Negron's authorized 50 hours per week were all linked to specific tasks like meal preparation, cleaning, personal hygiene, grocery shopping, errands, walking, and toileting.  In fact, that assessment found that she required 52.75 hours of care per week, all linked to specific tasks, but she was authorized to receive only 50 hours per week.

228.     Additionally, the notice's claim that "you were receiving over 7 hours per week independently for simple meal preparation, which should be considered part of the housekeeping support" is both false and misleading.

40

229.    Ms. Negron was assessed on March 27, 2015, and October 15, 2015.

230.    The assessment performed in March 2015 allocated six hours per week, not seven, for meal preparation.  The October 2015 assessment allocated two hours per week for this task, for a total reduction of four hours per week for meal preparation.

231.    The notice suggests that seven hours of the proposed reduction are due to a misallocation of meal preparation time, but, in fact, only four hours were removed for the meal preparation task.  The notice does not explain from what other task the remaining three hours would be removed.

232.    Even if the notice's assertions regarding the seven hours of meal preparation were factually correct, the fact that these tasks "should be considered part of the housekeeping support" is not a rational basis for a reduction as there is no allocation of time for a category of "housekeeping support" in any of the assessments.

233.    Similarly, the notice's assertions that (a) Ms. Negron's number of home care services was based on an "overestimation of the time needed" and (b) the most recent assessment "provides a more accurate amount of time" are both false and misleading.  The assessment performed in October 2015 found that Ms. Negron's condition had "declined" and that her overall self-sufficiency had "deteriorated" since the March 2015 assessment.

234.    Despite the fact that the nurse who assessed Ms. Negron's condition found that her condition had deteriorated, she recommended that Ms. Negron's care be reduced from 50 hours per week to 16.63 hours on the ATSP.  This was a radical reduction to the time allocated for individual tasks without any explanation of how the tasks can be completed.

235.    While the October assessment recommends 16.6 hours of care per week, the November notice Ms. Negron received notifies her of a reduction to 25 hours per week.  This

discrepancy, explained nowhere in the evidence packet, makes it difficult for Ms. Negron to adequately prepare for her Fair Hearing.

236.    For example, the March assessment allocated 83 minutes per week for the preparation of breakfast.  The October assessment allocated zero minutes for this task.  The assessment contains no explanation of how or whether Ms. Negron will eat breakfast if the reduction goes into effect.

237.    As another example, both the March assessment and the October assessment state that Ms. Negron's gait and balance are "unsteady."  The March assessment allocates 420 minutes per week for assistance with locomotion indoors.  The October assessment allocates only 70 minutes per week, or 10 minutes per day, for this task.  There is no explanation for how Ms. Negron will be able to manage even the most basic movements around her apartment, such as from her bedroom to her kitchen at mealtime, in only ten minutes per day.

238.    The March assessment allocated 630 minutes per week for toileting and 420 minutes per week for transfers on and off of the toilet.  The October assessment allocated only 70 minutes per week, or 10 minutes per day, for each of these tasks.  Ms. Negron requires assistance with toileting and transfers to the toilet throughout the day, well in excess of 20 minutes per day.  In fact, she uses the bathroom one to three times per hour and requires assistance with her pull-ups and dressing on each of those occasions.

239.    Neither the March assessment nor the October assessment documents consider the fact that toileting cannot be done all within one short period, but must be done over a span of time, and it cannot be scheduled.  Both assessments simply assign an amount of daily time to that task without regard to the fact that the need for assistance with the task naturally arises at unpredictable times around the clock.

240.     On December 5, 2015, because of extreme anxiety caused by the fear of losing her care and being institutionalized, Ms. Negron's heart rate escalated so much that she had to go to the emergency room.  She was in the hospital for 3 days.

241.     On December 5, 2015, Ms. Negron's care was restored pursuant to an aid-continuing directive.

242.     Ms. Negron has said that, if her reduction goes into effect, she may consider suicide because she does not want to go to a nursing home and knows that it will be impossible for her to remain safely in her home with only 25 hours of care per week.

243.     Ms. Negron's Fair Hearing was held on January 25, 2016.  At the hearing, Healthfirst Defendants withdrew their notice of reduction and agreed to maintain Ms. Negron's 50 hours of home care services for now.

244.     Because Ms. Negron still needs home care services to remain safely at home, and because she still receives those services from Healthfirst Defendants, she is vulnerable to a repetition of the harms alleged in this Complaint.


**MARIANO VAZQUEZ**

245.     Mariano Vazquez is an 83 year-old man who lives alone in Manhattan and receives Medicaid and Medicare.

246.     Mr. Vazquez speaks only Spanish.  He has great difficulty reading and writing, because of memory problems and because his hands are too shaky to write.  He cannot understand the Fair Hearing process, his rights to challenge the reductions, and the possibility of retaining counsel.  As a result, his niece Iraida Vasquez is acting as his Next Friend in this case.

247.    He suffers from numerous medical conditions including residual effects of meningitis in childhood, epilepsy, osteoporosis, tremors, and polyosteoarthritis.  He has been diagnosed with prostate cancer in the past, and has recently been evaluated for anemia.  Because of his meningitis, he has been disabled to some degree for all of his life, but his conditions have significantly worsened as he has aged.

248.    Because of his medical conditions, Mr. Vazquez needs assistance with many of his daily activities, including bathing and getting dressed, cooking, shopping, laundry, cleaning, moving about his apartment, and leaving his apartment.

249.    Mr. Vazquez uses a cane when he is inside and a rolling walker when he is outside. He needs the help of a person to move around safely, and he cannot leave his home without someone to help him.  When he is home alone he moves as little as possible for fear of falling. His diminished mental capacities make this even more challenging, because on occasion he forgets that he is not able to move safely.

250.    Until December 24, 2015, Mr. Vazquez received 35 hours per week of home care services through Senior Health Partners.

251.    Mr. Vazquez's 35 hours of home care services were provided 5 hours per day, 7 days per week.  Even those hours were not sufficient, in part because he has many medical appointments that require his aide's assistance to attend.  If they are scheduled later in the afternoon, he cannot go.

252.    Mr. Vazquez's family members visit him from time to time, but are unable to do so on a regular basis and cannot provide him with the care that he needs to remain safely at home.

253.    He struggles to keep himself safe and to accomplish necessary daily activities. For example, he cannot open his medication bottles by himself, and must take some medication at night. His aide helps him to open his medicine before she leaves so he is able to take his nightly medicine for his prostate condition.

254.    Mr. Vazquez cannot cook for himself or clean his apartment.  His hands are not steady enough, and he cannot maintain enough balance to move around his apartment to clean and use the kitchen. He is totally reliant on his aide to do these tasks.

255.    Mr. Vazquez's aide also helps him with remembering events and keeping meetings and appointments clear.  If he is meeting with his doctors alone, he is often confused and cannot answer their questions.  He needs to call his aide into the room to clarify during many appointments.

256.    Mr. Vazquez needs his aide's help in many of his transfers, especially while showering.  He can get to the bathroom, but needs assistance to ensure that he does not fall while getting in and out of the shower.  Depending on how he is feeling, and whether his back is hurting, he may need help washing as well.

257.    On or about December 24, 2015, Mr. Vazquez received a notice stating that Senior Health Partners would reduce his home care services to 24 hours per week effective January 8, 2016, based on an assessment done November 30, 2015.

258.    The notice is signed by Patricia Bronzert, an Associate Medical Director at Healthfirst.

259.    Because Mr. Vazquez was unable to read the notice himself, his home attendant looked at it for him, and told him that it was a letter from Senior Health Partners stating that his home care would be reduced.  She did not read to him the part of the notice that stated that he

45

had to request a fair hearing before January 8, 2016 in order to receive aid-continuing, or even that he had the right to a fair hearing.

260.    Mr. Vazquez made an appointment with his social worker at Mt. Sinai Hospital to show her the letter and to get help.  He was unable to get an appointment with her until January 22, 2016.

261.    On or about January 8, 2016, Mr. Vazquez's home care was reduced from 35 hours per week to 24 hours per week.

262.    This reduction left Mr. Vazquez with 4 hours of care per day, six days a week. He had no care at all on Sundays.

263.    On January 22, 2016 Mr. Vazquez met with his social worker at Mt. Sinai hospital; she read the notice and immediately requested a fair hearing for him.  By that time he no longer had a right to receive aid-continuing.

264.    The December 24, 2015 notice states that the reason for the reduction is to "correct a mistake" and because the "requested service is not medically necessary."   It states:

> We are changing the services from the prior authorization to correct a mistake we found in the previous personal care services authorization.  The requested service is not medically necessary at this time.

> After a review of all information, including the most current assessment, as outlined below, Healthfirst is changing the services you currently receive.  We are approving a total of 24 hours per week for personal care assistance support.

> We are changing the services you receive to correct a mistake we found in the previous personal care services authorization.  You were receiving 7 hours per week of additional services that were not linked to a specific personal care task and were removed. In accordance with NY State regulations and guidelines for Personal Care Assistance, services are intended to provide assistance with specific environmental and nutritional functions as well as activities of daily living.  See 18 NYCRR 505.14(a)(6) and the NYS Personal Care Guidelines released on May 31, 2013.  Also, some of your prior hours were based on an over estimation needed for your activities of daily living.  You were receiving 8 hours per week independently for simple meal preparation which should be

46

considered part of the Level 1 support time.  Additionally, you were receiving an additional 15 hours per week total for help with Level 1 support.  Your current assessment is based on your current condition and provides a more accurate amount of time while ensuring your personal care needs are met.

265.    The notice gives the false impression that the reduction is required by New York State regulations.

266.    The notice does not give Mr. Vazquez the information necessary to provide him with a meaningful basis to decide whether to request a Fair Hearing, and it does not provide him with the information necessary to defend against the proposed reduction at a Fair Hearing.

267.    The grounds for the reduction alleged in the notice are based not on any changes in his actual condition or needs, but rather on changes in the way that Healthfirst Defendants characterized his needs in their assessments and ATSPs.

268.    The assessments and ATSPs in the Evidence Packet Mr. Vazquez's attorneys obtained show that the proposed reduction was based on arbitrary limits and not on Mr. Vazquez's actual needs and that statements in the notice were false.

269.    For example, the statement in the notice that he had been receiving seven hours not linked to a specific task is false.  In fact, the seven hours per week in question were specifically referenced on the ATSP from February 20, 2015.  The assessment states that Mr. Vazquez has "had two falls in the last three months.  Requires extra time to slowly complete ADLS/IADLS safely to prevent future falls."

270.    Similarly, the notice's assertions that (a) Mr. Vazquez's number of home care services was based on an "overestimation of the time needed" and (b) the most recent assessment "provides a more accurate amount of time" are both false and misleading.

271.    Mr. Vazquez was assessed on February 20, 2015 and November 30, 2015.

272.    Although Mr. Vazquez had been receiving 35 hours of care per week, the February 20, 2015 assessment found that he needs 45 hours of care per week.

273.    The assessment performed in November 2015 found "no change" regarding Mr. Vazquez's need for assistance with activities of daily living or in his level of self-sufficiency.

274.    Both assessments, from February and November of 2015, mischaracterize his niece's involvement.  She helps him with arranging care and pre-pours his medicine, but is not available to provide care when the aide is not present.

275.    Despite the finding that Mr. Vazquez's conditions and needs had not changed, his care was reduced drastically.

276.    Mr. Vazquez's fair hearing was scheduled to be held on February 22, 2016.

277.    Mr. Vazquez did not receive the notice of the fair hearing and so did not attend. This resulted in a default, and his care was set at the reduced amount because he did not contest the reduction.

278.    Around this time, Mr. Vazquez was hospitalized for several days because he had pneumonia.

279.    Mr. Vazquez's niece visited him and called Senior Health Partners to request that he have care reinstated on Sundays.

280.    On March 7, 2016 Mr. Vazquez met with an attorney from NYLAG who visited him in the hospital.  At that time Mr. Vazquez learned that he had defaulted his fair hearing.

281.    On March 10, 2016, an attorney from NYLAG was able to have Mr. Vazquez's fair hearing reopened, and it has been scheduled for April 5, 2016.

282.    On or around March 7, he began receiving 28 hours of care per week, or 4 hours every day instead of six days a week.  This was a small increase from the 24 hours he had been

48

getting since January 8, but not back up to the 35 hours a week he had previously received. His care remains reduced from what he had been receiving and what he needs.

283.    Mr. Vazquez has been suffering with a reduced amount of care since January 8, 2016.

284.    His aide no longer has time to prepare all of his meals, keep his apartment clean or manage his other needs.

285.    One particular problem is that with one fewer hour each day, Mr. Vazquez does not have enough time to get to his appointments. Every day, his aide makes food for him and helps him shower. After accomplishing these tasks, there is now less time for shopping, errands and laundry as well as travel to and from appointments, and he has not been able to schedule meetings with doctors to follow-up on various issues.

286.    Until he received the additional four hours and got care on Sundays, Mr. Vazquez was unable to attend church on Sundays, which caused him a lot of distress. In fact, he could not leave his home at all on Sundays, because he had no homecare.

287.    Though having care each day helps, Mr. Vazquez is still suffering from the reduced hours. As his health needs increase, he is worried about making his appointments and getting the care that he needs with fewer hours.

**JUAN SANTOS**

288.    Juan Santos is a 93 year old man who lives with his daughter in the Bronx and receives Medicaid and Medicare.

289.    Mr. Santos has been diagnosed with Alzheimer's disease and other dementia as a result of which he is not able to understand the Fair Hearing process, his rights to challenge the proposed reductions, or the possibility of retaining counsel.  As a result, his daughter, Rita Baez,

who lives with him and handles his medical arrangements, is acting as his Next Friend in this case.

290.    In addition to Alzheimer's disease and other dementia, Mr. Santos has been diagnosed with diabetes, hypertension, chronic asthma, COPD, dysphagia, incontinence of the bladder and the bowel, epilepsy, and edema. He has also suffered several strokes and a heart attack.  Because of his neurological condition, he can move only his right arm and is otherwise not mobile.

291.    Because of his conditions, Mr. Santos needs total assistance with almost all of his activities of daily living.  He cannot move himself at all.  To leave his bed, he needs to be lifted and assisted, and in his home he sits in a wheelchair pushed by his aide.  He cannot leave his home without an aide to push his wheelchair.

292.    Mr. Santos needs assistance from his aide to do all of his bathing and personal hygiene tasks and in transferring from bed to his wheelchair and into the bath.  He is not continent of the bladder or bowel, and wears diapers to manage his incontinence.  He cannot change his own diapers or otherwise manage any of his personal hygiene.  His medication causes him to urinate very frequently and as a result, he needs his diapers to be changed every 2-3 hours to prevent skin breakdowns and ulcers.

293.    Mr. Santos cannot do any housekeeping tasks on his own.  He has no capacity to cook or clean, and cannot even feed himself.  He cannot shop nor do his laundry, as he cannot leave his house without being pushed in a wheelchair by an aide, and has diminished mental capacity.

294.    Because of his incontinence and because he spends much of his time in bed, Mr. Santos needs his bedding changed very frequently, usually 3-4 times a week.  If his incontinence is particularly frequent, his bedding may need to be changed daily.

295.    Mr. Santos cannot feed himself. He drinks water through a dropper, and his water along with other liquids is thickened to prevent him from choking.  He must be fed by his aides, and has a primarily liquid diet.  He has the ability to chew some of his food but does not remember to do this very often.

296.    Until February 8, 2016, Mr. Santos received 63 hours of homecare services per week, nine hours a day, seven days a week.  His daughter, Rita Baez, receives 28 hours a week, or four hours a day, seven days a week, so there is an aide present for 13 hours a day in their home.  Her hours have not been reduced.

297.    His daughter receives homecare services for her diabetes, high cholesterol, back pain, vertigo and breast cancer, and because of these and other conditions cannot assist in caring for her father. In particular, body pain makes it difficult for her to help move him—at times, she cannot get herself out of bed and cannot assist him at all.  She does not sleep through the night because she is caring for her father, despite her own needs, and sleeps during the day when the aide is present.

298.    Mr. Santos received a notice on or around January 22, 2016 that his hours would be reduced to 41 hours per week.  The notice said that the reduction was being made because the health care service is not medically necessary, and to correct a mistake in the previous personal care services authorization.

299.    The notice is signed by Patricia Bronzert, an Associate Medical Director at Healthfirst.

300.    Because Mr. Santos cannot read for himself, his daughter looked at it for him and then requested Aid-to-Continue after reading the notice, so his care was not reduced.  However, she needed to bring the notice to her social worker to understand what it was saying and the reasons for the reduction.

301.    The January 22, 2016 notice states that the reduction was being made because there was a mistake in the previous authorization regarding the time needed for activities of daily living and because some of the tasks that he was assigned were not covered by the plan.  It reads:

> We are changing the services from the prior authorization to correct a mistake we found in the previous personal care services authorization.
>
> You were receiving 5.25 hours per week for cognitive prompting. Cognitive prompting includes such activities as asking if you remember what day it is today or asking if you remember your address. This activity is considered to be an incidental function, and is not a specific standalone function required to be performed by a personal care assistant. See NYCRR 505.14.
>
> You were receiving 5.25 hours per week for Safety Supervision. Safety Supervision is not required to be covered as a standalone function. This function is included as an incidental component of many person care tasks according to your needs. See NYS administrative directive GIS 03/MA/003.
>
> Also, some of your activities were based on an over estimation of the time needed for your activities of daily living. You were receiving 21.33 hours per week for help with housekeeping task. [*sic*]
>
> The previous assessment noted cleaning the bedroom, kitchen and bath 7 times a week for a total of 315 minutes. This was excessive since there is no clinical reason for such frequent housekeeping. This was an overestimate for 195 minutes/3.25 hours.
>
> The previous assessment noted doing the laundry (off-site) 2 times a week. This was excessive since there is no clinical reason for such frequent housekeeping. This was an overestimation of 105 minutes/ 1.75 hours.
>
> The previous assessment also noted toileting 3 times per day in addition to incontinent care 4 times per day and 7 times per week. You received 420 minutes for incontinent care in addition to 210 minutes for toileting. This was a mistake

since you were given duplicate hours for toileting and incontinence care. This was excessive since there was no reason for the additional hours. This was an overestimate of 210 minutes / 3.5 hours.

This resulted in 19 hours of time that was not tied to the direct provision of activity of daily living level 1 and /or level 2 tasks or an overestimate of time.

Your current assessment is based on your current condition and provides a more accurate amount of time while ensuring your personal care needs are met.

After a review of all information, including the most current assessment, as outlined below, Healthfirst is changing the services you currently receive.  We are approving a total of 41 hours per week for personal care assistance support.

302.    The notice gives the false impression that the reduction is required by New York State regulations.

303.    The notice does not give Mr. Santos or his daughter the information necessary to provide him with a meaningful basis to decide whether to request a Fair Hearing, and it does not provide them with the information necessary to defend against the proposed reduction at a Fair Hearing.

304.    The grounds for the reduction alleged in the notice are based not on any changes in his actual condition or needs, but rather on changes in the way that Healthfirst Defendants characterized his needs in their assessments and ATSPs.

305.    The assessments and ATSPs in the Evidence Packet Mr. Santos's attorneys obtained show that the proposed reduction was based on arbitrary limits and not on Mr. Santos's actual needs and that statements in the notice were false.

306.    The assessments and ATSPs did not consider Mr. Santos for span-of-time care, despite the fact that they acknowledge that he is incontinent, cannot move on his own and cannot be left alone.

307.    The notice's assertions that (a) Mr. Santos's number of home care services was based on an "overestimation of the time needed" and (b) the most recent assessment "provides a more accurate amount of time" are both false and misleading.

308.    Mr. Santos was assessed on November 24, 2014, and December 14, 2015.

309.    The assessment performed in December 2015 found "no change" regarding Mr. Santos's need for assistance with activities of daily living or in his level of self-sufficiency.

310.    Despite the finding that Mr. Santos's conditions and needs had not changed, his care was reduced drastically.

311.    In fact, Mr. Santos's condition has deteriorated in the past year. His memory has degraded and he is less responsive.  He has diminished ability to move—for example, he cannot push himself up to sit in bed anymore and is completely dependent on his aide to help him move.

312.    Mr. Santos's Fair Hearing was scheduled to be held on February 25, 2016.

313.    When Mr. Santos's daughter contacted her social worker about obtaining assistance with the Fair Hearing, the social worker referred her case to NYLAG attorneys.

314.    NYLAG requested a telephone hearing for Mr. Santos so that he and his daughter would not have to attend and he would be eligible for *Varshavsky* relief.  This resulted in an adjournment to March 23, 2016.

315.    When Mr. Santos's NYLAG attorney attended this hearing, she requested that the Administrative Law Judge add an additional issue to the hearing to review a request for an increase to split-shift care for Mr. Santos.

316.    The judge consented to this request, but adjourned the hearing for a second time for the additional issue. That hearing has not yet been scheduled.

**FIRST CAUSE OF ACTION**
(*Against Healthfirst Defendants*)

317.    Healthfirst Defendants' custom and practice of threatening to reduce, and of

actually reducing, home care services without first providing a timely and adequate notice of

such adverse action, violates Plaintiffs' rights under 42 U.S.C.§ 1396a(a)(3) and its

implementing regulations at 42 C.F.R. § 431.100 *et seq.* and § 438.100 *et seq.*; N.Y. Soc. Serv.

Law § 22(12) and its implementing regulations; and the Due Process clauses of the 14th

Amendment to the United States Constitution, U.S. CONST. AMEND. XIV, § 1, and of the New

York State Constitution, N.Y. Const. Art. I, § 6.

**SECOND CAUSE OF ACTION**
(*Against Defendant Zucker*)

318.    Defendant Zucker's custom and practice of failing to ensure that Healthfirst

Defendants provide timely and adequate notices when threatening to reduce or actually reducing

home care services, despite his knowledge of Healthfirst Defendants' custom and practice of

failing to send such notices, violates Plaintiffs' rights under 42 U.S.C.§ 1396a(a)(3) and its

implementing regulations at 42 C.F.R. § 431.100 *et seq.* and § 438.100 *et seq.*; N.Y. Soc. Serv.

Law § 22(12) and its implementing regulations; and the Due Process clauses of the 14th

Amendment to the United States Constitution, U.S. CONST. AMEND. XIV, § 1, and of the New

York State Constitution, N.Y. Const. Art. I, § 6.

**THIRD CAUSE OF ACTION**
(*Against Healthfirst Defendants*)

319.    Healthfirst Defendants' custom and practice of threatening to reduce or actually

reducing home care services based on arbitrary limits on care violates Plaintiffs' rights under

the Due Process clauses of the 14th Amendment to the United States Constitution, U.S. CONST.

AMEND. XIV, § 1, and of the New York State Constitution, N.Y. Const. Art. I, and under Soc.

Serv. Law § 22(12) and its implementing regulations.

### FOURTH CAUSE OF ACTION
#### (*Against Defendant Zucker*)

320.    Defendant Zucker's custom and practice of failing to ensure that Healthfirst

Defendants do not threaten to reduce or actually reduce home care services based on arbitrary

limits on care, despite Defendant Zucker's knowledge of Healthfirst Defendants' custom and

practice of doing so, violates Plaintiffs' rights under the Due Process clauses of the 14th

Amendment to the United States Constitution, U.S. CONST. AMEND. XIV, § 1, and of the New

York State Constitution, N.Y. Const. Art. I, and under N.Y. Soc. Serv. Law § 22(12) and its

implementing regulations.


WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment:

1.    Certifying this case as a class action, pursuant to Rules 23(a) and (b)(2) of the

Federal Rules of Civil Procedure, with the class defined as:

> All current and future Medicaid recipients who receive home care services
> through Healthfirst Defendants' MLTCs and who have suffered since January 1,
> 2015, or who will suffer threatened or actual reductions of their home care
> services without timely and adequate notice, and / or based on arbitrary limits on
> care.

2.    Declaring that:

a.    The Healthfirst Defendants' custom and practice of threatening to reduce,

and actually reducing, home care services without first providing timely and

adequate notice violates Plaintiffs' rights under 42 U.S.C. § 1396a(a)(3) and  its

implementing regulations at 42 C.F.R. § 431.100 *et seq.* and § 438.100 *et seq.*; N.Y.

Soc. Serv. Law § 22(12) and its implementing regulations; and the Due Process

clauses of the 14th Amendment to the United States Constitution, U.S. CONST. AMEND. XIV, § 1, and of the New York State Constitution, N.Y. Const. Art. I, § 6.

b.      Defendant Zucker's custom and practice of failing to ensure that the Healthfirst Defendants provide timely and adequate notice when they threaten to reduce or reduce home care services, despite Defendant Zucker's knowledge of Healthfirst Defendants' custom and practice of failing to send such notices, violates Plaintiffs' rights under 42 U.S.C. § 1396a(a)(3) and its implementing regulations at 42 C.F.R. § 431.100 *et seq.* and § 438.100 *et seq.*; N.Y. Soc. Serv. Law § 22(12) and its implementing regulations; and the Due Process clauses of the 14th Amendment to the United States Constitution, U.S. CONST. AMEND. XIV, § 1, and of the New York State Constitution, N.Y. Const. Art. I, § 6.

c.      The Healthfirst Defendants' custom and practice of threatening to reduce or actually reducing home care services based on arbitrary limits on care, violates Plaintiffs' rights under the Due Process clauses of the 14th Amendment to the United States Constitution, U.S. CONST. AMEND. XIV, § 1, and of the New York State Constitution, N.Y. Const. Art. I, and under N.Y. Soc. Serv. Law § 22(12) and its implementing regulations.

d.      Defendant Zucker's custom and practice of failing to ensure that Healthfirst Defendants do not threaten to reduce or actually reduce Plaintiffs' home care services based on arbitrary limits on care, despite Defendant Zucker's knowledge of Healthfirst Defendants' custom and practice of doing so, violates Plaintiffs' rights under the Due Process clauses of the 14th Amendment to the United States Constitution, U.S. CONST. AMEND. XIV, § 1, and of the New York

State Constitution, N.Y. Const. Art. I, and under N.Y. Soc. Serv. Law § 22(12) and its implementing regulations.

3.      Enjoining

a.      Healthfirst Defendants from threatening to reduce, and actually reducing, home care services without first providing timely and adequate notice;

b.      Healthfirst Defendants from threatening to reduce or actually reducing home care services based on arbitrary limits to care;

c.      Healthfirst Defendants to provide a new notice, and Defendant Zucker to provide a new opportunity for a Fair Hearing, to any class member whose home care services were actually reduced after January 1, 2015 due to an alleged prior mistake, where the reduction was not affirmed in a DAFH;

d.      Defendant Zucker to ensure that Healthfirst Defendants provide timely and adequate notice when they threaten to reduce or reduce home care services; and

e.      Defendant Zucker to ensure that Healthfirst Defendants do not threaten to reduce or actually reduce Plaintiffs' home care services based on arbitrary limits on care.

4.      Awarding reasonable attorney's fees pursuant to 42 U.S.C. § 1988(b);

5.      Awarding costs and disbursements; and

6.      Granting such other and further relief as the Court may deem just and proper.

Dated: April 1, 2016
New York, New York

NEW YORK LEGAL ASSISTANCE GROUP
BETH GOLDMAN, ESQ.

By: ___/s/ Jane Greengold Stevens_____
Jane Greengold Stevens, of counsel
Michelle Movahed, of counsel
Benjamin W. Taylor, of counsel
Elizabeth Jois, of counsel
7 Hanover Square, 18th Floor
New York, NY 10004


Telephone: (212) 613-5000
Facsimile:  (212) 750-0820
Email:  jstevens@nylag.org
Email:  mmovahed@nylag.org
Email:  btaylor@nylag.org
Email:  ejois@nylag.org

*Counsel for Plaintiffs, individually and on behalf*
*of all others similar situated*


PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP

Andrew Ehrlich
Karen King
Patrick Somers
Rebecca Matte

1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Fax:  (212) 757-3990
aerlich@paulweiss.com
kking@paulweiss.com
psomers@paulweiss.com
rmatte@paulweiss.com

*Attorneys for Jie Du, by her next friend Michael*
*Tong, individually and on behalf of all others*
*similarly situated*